553 P.2d 688

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Michael G. RONDEAU and Edwin Joseph Beaty, Defendants-Appellants.**

**Nos. 10273, 10262.**

Supreme Court of New Mexico.

Aug. 20, 1976.

M. Ralph Brown, Albuquerque, Bruce L. Herr, App. Defender, Santa Fe, for defendants-appellants.

Toney Anaya, Atty. Gen., Santa Fe, James L. Brandenburg, Dist. Atty., Judith Zabel, Asst. Dist. Atty., Albuquerque, for plaintiff-appellee.

## OPINION

McMANUS, Justice.

This is a direct appeal from the conviction of two defendants, Edwin Beaty and Michael G. Rondeau, of first degree murder and robbery while armed with a deadly weapon. Both defendants were indicted

separately, but they were tried together before a jury after their trial was consolidated by order of the District Court of Bernalillo County. Both defendants were convicted and they appealed to this court. After the appeal had been docketed, the cause was remanded to the district court so that a motion for a new trial based on newly discovered evidence could be heard. The motion was denied. This appeal resumed. We affirm the convictions.

The police were in the process of investigating a robbery-murder of a taxicab driver in Albuquerque when certain informants contacted them. These informants related that the defendants, Rondeau and Beaty, had bragged to them about killing a taxicab driver. The informants gave certain bits of information, which led the police to the motel where the two were staying. Not long after the police located the suspects they arrested them, although initially not on the charge of murder. Rondeau was arrested for speeding, driving without a license, and possession of dangerous drugs. Beaty was arrested for contributing to the delinquency of a minor. Both were charged with murder and armed robbery shortly after their arrest.

In this appeal the defendants jointly allege eleven points of error. The first two points are:

I: "Imposition and carrying out of the death penalty in this case, pursuant to N.M.Stat.Ann. Sec. 40A–29–2 (1973 Supp.) constitutes cruel and unusual punishment and deprivation of liberty without due process of law."

II: "The statute purporting to re-establish the death penalty, and the felony murder statute, are unconstitutional because they violate the New Mexico Constitution."

Pending a final decision by this court on the merits of this appeal, the United States Supreme Court decision of July 2, 1976, with respect to the death penalty statutes of North Carolina and Louisiana, i.e., *Woodson v. North Carolina,* —— U.S. ——, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana,* —— U.S. ——, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), informed us that mandatory death sentences in specified circumstances which leave neither judge nor jury discretion to impose a lesser sentence violate the eighth amendment prohibition against cruel and unusual punishment.

Our § 40A–29–2, N.M.S.A.1953 (Supp. 1975) imposes a mandatory death penalty upon a finding of murder:

"When a defendant has been convicted of a capital felony the judge shall sentence that person to death; Provided, that if a person has not reached the age of majority at the time of the commission of the crime for which he is charged, the judge, upon conviction, shall sentence him to a term of life imprisonment."

In *Woodson v. North Carolina,* supra, the United States Supreme Court declared North Carolina's mandatory death penalty statute unconstitutional. North Carolina's statute is similar to § 40A–29–2, N.M.S.A.1953 (Supp.1975) in that both statutes impose a mandatory death sentence with no alternatives available to either the judge or jury to mitigate such a penalty. The Court concluded that this type of statute offends contemporary societal standards and therefore is proscribed by the eighth and fourteenth amendments. Although the Court found that a death sentence is not itself a cruel and unusual punishment, the automatic death penalty has been historically rejected by both juries and legislatures and is an unacceptable mode of punishment by current civilized standards. The amendment to New Mexico's death penalty statute in 1973 imposing mandatory death sentences was the Legislature's response to the admonition of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) to remove the element of capriciousness which was present when the jury had unlimited discretion in determining the application of the death penalty. A legislative enactment

imposing the automatic death sentence is, however, an impermissible response when viewed in light of today's social values and "has been rejected as unduly harsh and unworkably rigid." *Woodson v. North Carolina,* supra, —— U.S. at ——, 96 S.Ct. at 2986, 44 U.S.L.W. at 5271.

The Court also found that in addition to being offensive to contemporary attitudes toward capital punishment, the mandatory death penalty had not resolved the problem of unguided and unchecked jury discretion which was condemned in *Furman.* Withholding all discretion is equally constitutionally repugnant and *Woodson* calls for "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson,* supra, —— U.S. at ——, 96 S.Ct. at 2991.

The final defect in this statutory scheme is that it fails "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson,* supra, —— U.S. at ——, 96 S.Ct. at 2991. The Court explained further:

> " . . . [W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles,* 356 U.S. [86], at 100 [78 S.Ct. 590, at 597, 2 L.Ed.2d 630] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."

*Id.,* —— U.S. ——, 96 S.Ct. at 2991.

■■■ We reaffirm our stated position in *Serna v. Hodges,* 89 N.M. 351, 552 P.2d 787 (1976) that the death penalty in and of itself does not amount to cruel and unusual punishment within the prohibition of the eighth amendment of the Constitution of the United States or Art. II, § 13 of the New Mexico Constitution. However, the rationale of *Woodson* is directly applicable to § 40A–29–2, supra, since the statute does not permit the exercise of controlled discretion, but mandates a death sentence upon the conviction of a capital felony. We therefore hold that § 40A–29–2, supra, is constitutionally defective and must fall. We overrule *Serna v. Hodges,* supra, insofar as § 40A–29–2 was held constitutional. (See also, *State v. Rumsey,* 226 S.E.2d 894, (S.C.1976) invalidating South Carolina's death penalty statute.)

■■ We must now address the issue of imposing a sentence for a felony conviction since § 40A–29–2 is no longer operative. The Legislature repealed the former death penalty provision in Ch. 109, § 3, [1973] N.M.Laws 342–343 and adopted the current provision in Ch. 109, § 2, [1973] N.M.Laws 342, and amended it by Ch. 320, § 5, [1975] N.M.Laws 1868. The effect of *Woodson* not only operates to declare § 40A–29–2 unconstitutional, but also determines that the former death penalty provisions, § 40A–29–2 through § 40A–29–2.3, are still effective. An unconstitutional act is as inoperative as if it had never been passed, and the subsequent unconstitutional act cannot repeal the existing law. *Town of Las Cruces v. El Paso Cotton Industries,* 43 N.M. 304, 92 P.2d 985 (1939). The general common law rule is stated in 1A A. Sutherland, Statutes and Statutory Construction, § 23.24 (4th ed.1972):

> " . . . [A]n unconstitutional statute which purports to repeal a prior statute by specific provision is ineffective to do so where, under standard rules governing separability a hiatus in the law would result from the impossibility of substituting the invalid affirmative provisions for the legislation that was to be repealed, or when the repeal is the sole purpose of the enactment . . . ."

During the interim between the declaration of the statute's unconstitutionality and a new enactment by the Legislature which meets constitutional standards, the former statute is revived and becomes effective without any formal act by the Legislature,

absent a contrary legislative intent. *Gallegos v. Atchison, T. & S.F. Ry. Co.*, 28 N. M. 472, 214 P. 579 (1923). See also *Schaffer v. Green*, 496 P.2d 375 (Okl.Cr. App.1972). The fact that the subsequent unconstitutional act retained the death penalty and life imprisonment indicates a legislative intent to impose some type of punishment for such felonies. The revival of § 40A–29–2 through § 40A–29–2.3 would not offend any explicit or implicit legislative directive.

The next question to be resolved is whether the 1963 and 1969 laws regarding punishment for first degree murder are constitutional in light of *Furman, Gregg, Proffitt, Jurek, Woodson* and *Roberts*.[1] The 1963 and 1969 statutes read as follows:

> 40A–29–2. Sentencing authority.—Capital felonies.—When a defendant has been convicted of a capital felony the judge shall sentence that person to death, unless the jury trying such case shall recommend life imprisonment, then the judge shall sentence that person to life imprisonment; provided that in cases wherein the defendant has entered a plea of guilty to the commission of a capital felony, the court may in lieu of sentencing such person to death, sentence the defendant to life imprisonment.

> 40A–29–2.1. Capital punishment limited. —Punishment by death for any crime is abolished except for the crime of killing a police officer or prison or jail guard while in the performance of his duties and except if the jury recommends the death penalty when the defendant commits a second capital felony after time for due deliberation following commission of a capital felony.

> 40A–29–2.2. Maximum punishment.— All crimes for which capital punishment

is abolished by section 1 [40A–29–2.1] are punishable by a penalty of life imprisonment in the state penitentiary.

40A–29–2.3. Persons previously sentenced to death.—Any person currently under penalty of death shall have such penalty revoked, and a penalty of life imprisonment substituted.

■■■ Section 40A–29–2 sets forth no standards and leaves the recommendation of life imprisonment or death to the unbridled discretion of the jury, thereby violating the directive of *Furman*. The limited circumstances encompassed under § 40A–29–2.1 are not present in this case and therefore we need not determine whether the statute meets the standards set forth in the above cases. Since § 40A–29–2 is unconstitutional, and § 40A–29–2.1 is inapplicable, § 40A–29–2.2 is effective and the maximum penalty is life imprisonment. We now consider the next issues raised by the defendants in this case.

III: "The trial court erred in denying [Rondeau's] motion to suppress the map and bullets seized from [him] at the time of his arrest."

■■■ Our only concern under this point is to determine whether the trial court had substantial evidence to support its denial of Rondeau's motion to suppress evidence seized from him at the time of his arrest.

As this court indicated in *State v. Deltenre*, 77 N.M. 497, 499, 424 P.2d 782, 783 (1966), cert. denied, 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967):

> "A search without a warrant is lawful when the search is incident to a lawful arrest and the legality of the arrest without a warrant depends upon whether the arrest was based upon probable cause. (citations omitted)."

---

1. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia*, —— U.S. ——, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, —— U.S. ——, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, —— U.S. ——, 96 S.Ct. 2950, 49

L.Ed.2d 929 (1976); *Woodson v. North Carolina*, —— U.S. ——, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976); *Roberts v. Louisiana*, —— U.S. ——, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

In defining probable cause the court in *State v. Deltenre,* supra, took the following quotation from *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L. Ed. 1879 (1949):

"* * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543."

77 N.M. at 501, 424 P.2d at 784. See also *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

Similarly, the United States Supreme Court held in *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973):

"It is the fact of the lawful arrest which establishes the authority to search, and . . . in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

See also *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

At the hearing on the motion to suppress evidence seized from Rondeau at the time of his arrest the trial court was presented with the following evidence: that the police observed Rondeau engage in what appeared to be a drug transaction just prior to his arrest; that the police clocked the vehicle driven by Rondeau going approximately 50 miles an hour in a 35 mile per hour zone; that when asked for his driver's license, Rondeau stated that he had none.

We conclude that the trial court was presented with substantial evidence that the police had probable cause to arrest and search Rondeau. The hand-drawn map of the area where the cab driver had been found shot to death, the pouch containing .22 caliber bullets and the pair of boots worn by Rondeau, all of which were seized from Rondeau as a result of his arrest, were properly admitted into evidence by the trial court.

IV: "The arrest of Edwin Beaty was unlawful, and therefore the gun seized in the search incident to that arrest should have been suppressed."

 Both appellants Rondeau and Beaty attack the arrest of Beaty as being unlawful. We will assume, for the sake of argument, that Rondeau has standing to challenge the arrest of Beaty.

We will apply the reasoning developed in point III to determine whether the trial court had substantial evidence to deny the motions to suppress the gun seized from Beaty incident to his arrest. At the hearing on these motions to suppress, the trial court was presented with the following evidence: that informants had told the police that Rondeau and Beaty were the ones who had robbed, shot and killed the cab driver; that these informants had further told the police that Rondeau and Beaty were in possession of a .22 caliber revolver, and driving a white and red Thunderbird, with a front headlight out; that the police had located this vehicle at the Bel-Air Motel in front of room 44, which the police found to be registered to Michael Rondeau and others; that, at one point during the surveillance of the room, the police observed two men drive up in the Thunderbird, get out, and enter room 44, one of them, later identified as Rondeau, carrying a pistol; that Rondeau had subsequently been arrested in the Thunderbird, searched, and the items mentioned in point III seized; that five tin-foil packets of what appeared to be drugs were also found on Rondeau when he was arrested; that one of the policemen who had arrested and searched Rondeau later arrested Beaty at the motel room; that the police knew, from talking with her parents, that Jodi Roach, who was reported to be in the company of Rondeau and Beaty, was under 18

and a runaway; that the police observed a young girl, who appeared to be a juvenile, enter room 44 where Beaty was; that, as the police approached the room they saw Beaty through the window pick up a gun and stick it under a bed; that when the police knocked, Beaty opened the door, and the police detected what appeared to be a strong odor of marijuana; that the police saw several empty beer cans in the room, and two girls who appeared to be under 18.

Based upon these facts and circumstances we conclude that the trial court had substantial evidence to support its denial of the motions to suppress the .22 caliber pistol seized in connection with the arrest of Beaty. There was substantial evidence that the police had probable cause to believe that an offense had been or was being committed. This being true, the trial court could and did reasonably conclude that the arrest and search were lawful, and that the gun seized was properly admissible into evidence.

V: "The trial court erred in admitting testimony of out-of-court statements made by co-defendant Beaty.

A. Testimony of statements made by co-defendant Beaty violated the rule against hearsay.

B. Testimony of statements made by co-defendant Beaty violated defendant Rondeau's right to confront the witnesses against him."

Inasmuch as both defendants complained of the admission of certain out-of-court statements made by defendants Beaty and Rondeau we will list the out-of-court statements as follows:

1) State's witness Jodi Roach Pirtle testified that at the Zia Lodge, prior to the events in question, the defendants said they had a plan to get money, and needed her car. Ms. Pirtle did not remember which defendant had made the statement. State's witness Mathilda Wienhert Prokash attributed the statement to Beaty.

2) Ms. Pirtle testified that Beaty asked her if she knew the area around Speedway Park, and told her that she, Ms. Prokash and he were to go to the park, and meet Rondeau there. Ms. Prokash also testified that Beaty asked Ms. Pirtle if she knew the layout of South Eubank.

3) Both Ms. Pirtle and Ms. Prokash testified that after Rondeau and Beaty made a telephone call for a taxi from Central and California, the defendants told the girls to wait until the defendants were picked up by a cab, then to proceed to Speedway Park, wait until a car arrived and turned off its lights, wait five minutes more, then pick them up.

4) Ms. Prokash testified that after the girls had picked up the defendants as planned, Beaty handed Ms. Pirtle seven dollars, saying, "Here, this is what we owe you." Ms. Pirtle was not able to say which defendant made this statement, but admitted that Beaty owed her seven dollars.

5) Ms. Prokash testified that when the girls left the defendants at the Zia Lodge the defendants told them, "We'll see you later, and don't say anything to anybody."

6) State's witness Mike Tripp testified that about two weeks after the incident, at the Zuni Motor Lodge, he heard Rondeau say, referring to the cab driver, "I wish he wouldn't have turned around." to which Beaty replied, "So what?"

7) Ms. Pirtle testified that about a week after his arrest, Beaty called her from the juvenile detention home, told her that he had read her statement (in which she said that Beaty had not accompanied Rondeau in the cab, but had remained with the girls) and that she should not lie to protect him, but tell the truth.

Appellant Rondeau concedes that statements one through six were properly admitted under exceptions to the hearsay rule because they were made during the course of the conspiracy. Rondeau does complain

about statement seven. Appellant Beaty claims the statements above numbered 1, 3, 4 and 5 were inadmissible hearsay, as was another statement by Ms. Prokash that when both Rondeau and Beaty were in the car, Rondeau said, "It isn't going to work. Let's get out of here."

We agree with appellant Rondeau that the admission of statements one through six did not violate the hearsay rule. In fact, under Rule 801(d)(2)(E) of the New Mexico Rules of Evidence [§ 20–4–801(d)(2)(E), N.M.S.A.1953 (Supp. 1975)], statements made by the co-conspirator of a party during the course and in furtherance of the conspiracy, which are offered against a party, are not merely exceptions to the hearsay rule, but do not even constitute hearsay as it is defined in Rule 801, supra. The additional statement challenged by appellant Beaty likewise does not constitute hearsay since it was made during the course and in furtherance of the conspiracy.

Rondeau challenges statement number seven in which Ms. Pirtle testified as follows:

"He (Beaty) told me that he had read my statement and he asked me not to lie for him, to tell the truth."

In our opinion, this statement does not implicate Rondeau at all and at most the statement was harmless. Ms. Pirtle did not testify that Beaty told her to tell the police any specific thing concerning Rondeau, just "the truth."

The second point raised by both appellants is that even if the statements were admissible as a matter of state evidentiary law, their admission (or at least the admission of some of them) violated the defendants' right of confrontation under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which held that the admission of a confession of a codefendant who did not take the stand deprived the defendant of his rights under the sixth amendment confrontation clause, when that confession implicated the defendant. While the confrontation clause, as it appears in the sixth amendment, does not specifically provide for exceptions, the U.S. Supreme Court has held that the admission of the declarations of a co-conspirator does not necessarily violate the right of confrontation. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Delaney v. United States,* 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924). Furthermore, the U.S. Supreme Court has indicated that even where the admission of a co-conspirator's testimony may constitute a technical violation of the accused's right to confront and cross-examine the witnesses against him, such admission does not require a reversal of conviction if it constituted error "harmless beyond a reasonable doubt." *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Under the facts and circumstances of the case before us we conclude that the admission of those statements which might possibly be considered violative of the *Bruton* rule was harmless beyond a reasonable doubt since the properly admitted evidence of guilt was overwhelming, and the prejudicial effect of the codefendants' statements was insignificant by comparison. See *Schneble v. Florida,* supra, 405 U.S. at 430, 92 S.Ct. 1056; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We conclude, therefore, that the trial court did not commit reversible error in admitting any of these statements.

VI: "The trial court erred in granting the state's motion to consolidate defendants Rondeau and Beaty."

Both appellants claim that *State v. Benavidez,* 87 N.M. 223, 531 P.2d 957 (Ct. App.1975) and *State v. Volkman,* 86 N.M. 529, 525 P.2d 889 (Ct.App.1974) are controlling in this case. We do not agree.

Both of these court of appeals cases construed Rule 34(b)(2) of the New Mexico Rules of Criminal Procedure [§ 41–23–34(b)(2), N.M.S.A.1953 (Supp.1975)] as

requiring reversal of conviction where the trial court refused to grant the defendant's motion for severance despite the fact that certain evidence admissible against the other defendant would constitute inadmissible hearsay in a separate trial of the moving defendant. The Court of Appeals correctly pointed out in those cases that while subsection (a) of Rule 34, supra, requires a showing of prejudice, subsection (b) does not.

However, we distinguish those cases from the case at bar for several reasons. To begin with, as we pointed out in our discussion of the admission into evidence of the co-conspirator's statements, we do not believe that any of the statements brought to our attention by the appellants were inadmissible hearsay. All of the statements would have been admissible even if the defendants had been tried separately, because N.M.R.Evid. 801(d)(2), supra, explicitly excludes them from the definition of hearsay.

Secondly, Rule 34(a), supra, leaves the decision to grant or deny a separate trial largely in the hands of the trial court. We find in the present case that the trial court did not abuse its discretion in denying defendants' motions to sever.

Finally, even where the trial court errs in failing to find that the prosecution will probably present evidence against a joint defendant which would not be admissible in a separate trial of the moving defendant, this court will not reverse a defendant's conviction if said error is harmless and the evidence admitted is not crucial to a determination of the defendant's guilt. We hold that this was harmless error. See *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

VII: "The trial court erred in denying defendant's motion for mistrial, because the prosecution failed to disclose the results of an F.B.I. examination of photographs of boot prints."

At some point prior to or during the trial the state sent photographs of foot- prints found at the scene of the crime, as well as photographs of prints made by the police with boots seized from Rondeau, to the F.B.I. for comparison. The F.B.I. report indicated that there were not enough characteristics in the photographs to identify positively the footprints at the scene of the crime as Rondeau's. There is some question as to exactly when this report first became available to the defense, but the prosecution did reveal to the court and defense counsel the existence and the contents of this F.B.I. report during the trial. Furthermore, the district attorney indicated to the trial court that it was his general policy to give the defense complete access to the prosecution files, and defense counsel acknowledged that this had been done in this case.

However, even assuming arguendo that the prosecution suppressed this F.B.I. report until late in the trial, we would still conclude that the trial court did not err in denying defendant's motion for mistrial. Appellants cite *Brady v. Maryland,* 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for the proposition that the prosecution is under a constitutional duty to disclose all exculpatory material to the defense or suffer a mistrial or a reversal on appeal.

We interpret *Brady v. Maryland,* supra, differently. In that case Brady and a companion, Boblit, were convicted of first degree murder and sentenced to death. Brady admitted participation in the crime but claimed that Boblit actually did the killing. Prior to trial Brady's attorney asked the prosecution to allow him to examine Boblit's extrajudicial statements. The prosecution showed him some of the statements, but withheld the one in which Boblit admitted the homicide. This statement did not come to Brady's attention until after he had been tried, convicted and sentenced to death, and after his conviction had been affirmed by the Court of Appeals of Maryland.

Brady applied to the trial court for post-conviction relief after he discovered the suppressed confession. When the trial

court denied him such relief he appealed to the Maryland Court of Appeals, which held that suppression of the evidence by the prosecution denied Brady due process of law, and remanded for a retrial the question of punishment, but not the question of guilt (both questions had been previously determined by the jury). The Court of Appeals restricted the retrial to the question of punishment because nothing in the suppressed confession " 'could have reduced the appellant Brady's offense below murder in the first degree.' " *Brady v. Maryland,* supra at 90, 83 S.Ct. at 1198.

Based upon these facts the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* supra at 87, 83 S.Ct. at 1196.

The Supreme Court, however, affirmed the Maryland Court of Appeals in restricting the retrial to the issue of punishment.

■■■ We interpret this to mean that a convicted defendant would be entitled to a retrial where the prosecution suppressed, throughout the whole trial, exculpatory evidence material to the guilt or punishment of the defendant. See *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Relating this to our case we note that the F.B.I. report was brought to the attention of the defense during the trial, rather than after the trial as in *Brady.* Secondly, we fail to see how this report could have reduced the defendants' offense below murder in the first degree. We, therefore, consider the F.B.I. report immaterial to the issue of the defendants' guilt.

■■ Defendants argue alternatively that the admission of the boots and photographs constituted plain error since they were, according to the defendants, irrelevant and immaterial. However slight the probative value of the boots and photographs were, they were relevant because

they tended to show that the tracks found at the scene of the crime were made by boots or shoes the same size or smaller than the tracks, and that since Rondeau's boots were smaller than the tracks they could have been the boots that made the tracks. These pictures were in turn material because they helped to establish whether Rondeau had been at the scene of the crime or not.

VIII: "The trial court erred in questioning witness David Richardson and eliciting his opinion regarding the source of the boot prints found at the scene of the crime."

■■ Appellants contend that detective Richardson was not qualified as an expert witness with respect to boot print comparison. The state conceded they had no such expert but used Richardson as a lay witness. Non-expert testimony may be received in certain instances, especially where, as here, descriptive language is inadequate to convey the precise facts to the jury, or the bearing of these facts on the issue. Then the description of the witness must of necessity be allowed to be supplemented by his opinion. See *State v. Torres,* 82 N.M. 422, 483 P.2d 303 (1971); *Pavlos v. Albuquerque National Bank,* 82 N.M. 759, 487 P.2d 187, 56 A.L.R.3d 558 (Ct.App.1971). The trial court did not abuse its discretion in allowing such testimony.

In *Martinez v. State,* 169 Tex.Cr.R. 229, 333 S.W.2d 370 (1960) there was opinion evidence offered by a lay witness regarding the similarity between the accused's shoes, and prints found at the scene of the crime. The court, in holding that measurements of the prints were not a precondition of the expression of such opinions, took the following quotation from the previous case of *Mueller v. State,* 85 Tex.Cr. 346, 215 S.W. 93 (1919):

"On the contrary, the unbroken line of decisions of this state, and every other state with which we are familiar, hold * * * that a witness who has made

measurements of the tracks, and the foot or shoe of the defendant, or who has made some such comparison between the tracks and the shoes of the defendant, as placing the shoe in the tracks, *or who has detailed peculiarities in the tracks on the ground which correspond with the shoes*, or with the proven or admitted tracks of the defendant, that in either of these cases or instances the witness may give his opinion as to the similarity of the tracks."

Id., 169 Tex.Cr.R. at 232–233, 333 S.W. 2d at 373.

We find that the trial court acted properly in admitting the testimony of the witness Richardson.

IX: "The trial court erred in denying the defendants' motion for new trial based on the State's failure to disclose evidence favorable to defendants.

X: "The trial court erred in denying defendants' motion for new trial based on newly discovered evidence (the phone calls)."

■ Detective Garcia had intercepted three phone calls from or to the motel room where the two defendants were headquartered. Appellants claim that the State's failure to disclose such conversations during trial constitutes a reversible error. We have examined the testimony regarding the contents of these three intercepted phone calls, and we have difficulty understanding how they were in any way favorable to the defendants. Nevertheless, even if the defendants might have figured out some way to use these calls to their advantage, we conclude that neither the fact that they were intercepted, nor their contents is material to the issue of the guilt or innocence of the defendants. Nothing concerning these calls could have reduced the appellants' offense below murder in the first degree.

This is not to say that we approve of the illegal interception of these calls by the police, or of the suppression of this evidence by the prosecutor, for we emphatically do

not. We do hold, however, that this evidence was totally immaterial to the issue of the defendants' guilt or innocence. Therefore, the trial court did not err in denying defendants' motions for new trial based upon the State's failure to disclose it to the defendants until after trial. Nor did the trial court err in denying defendants' motions for new trial based upon the newly discovered evidence since that evidence was immaterial.

XI: "The transfer of Edwin Joseph Beaty from the children's court to the district court was void."

■ At a previous hearing on a motion to remand brought by Beaty we held that the finding by the judge of the children's court that "[t]he child committed the alleged delinquent acts" was not an adjudicatory finding sufficient to form the basis of a double jeopardy claim. Here Beaty argues that since such a finding was apparently beyond the jurisdiction of the children's court, that finding must be void. Beaty further argues that if that finding is void then his transfer to the district court must also be void.

The flaw in this "logic" is that even if the children's court exceeded its jurisdiction in making such a finding, it most certainly did not exceed its jurisdiction in transferring Beaty over to the district court if there were reasonable grounds to believe that Beaty committed the delinquent act alleged, which there were. See §§ 13–14–27, 27.1, N.M.S.A.1953 (Supp.1975).

In conclusion, we quote from an opinion written by Mr. Justice Cardozo in the murder case of *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934):

"There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of compe-

**420**

tent jurisdiction in obedience to local law, and set the guilty free."

As the mandatory death provisions under the circumstances enumerated in § 40A–29–2 are unconstitutional, in line with the procedure permitted in *Furman*, we affirm appellants' convictions of murder and reverse only imposition of the death penalty, leaving the defendants subject to the constitutionally permissible life sentence provision of § 40A–29–2.2, N.M.S.A.1953. Accordingly, the case is remanded to the District Court of Bernalillo County for the purpose of sentencing the appellants to life imprisonment.

IT IS SO ORDERED.

OMAN, C. J., and MONTOYA, J., concur.