681 P.2d 708

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**David Leon CHEADLE,
Defendant-Appellant.**

**No. 14177.**

Supreme Court of New Mexico.

Nov. 21, 1983.

Rehearing Denied Dec. 21, 1983.

Stay Granted and Mandate Recalled
Jan. 5, 1984.

Certiorari Denied, April 16, 1984.
See 104 S.Ct. 1930.

**OPINION**

RIORDAN, Justice.

David Leon Cheadle (Cheadle), was convicted of murder in the first degree for which he received a sentence of death. Cheadle was also convicted of kidnapping in the first degree for which he received nineteen years imprisonment, kidnapping in the second degree for which he received ten years imprisonment, two counts of armed robbery in the second degree for which he received ten years imprisonment for each count, and criminal sexual penetration in the second degree for which he received four years imprisonment. Cheadle appeals. We affirm.

The issues on appeal are:

I. Whether the trial court erred in denying Cheadle's motion to strike certain identification testimony.

II. Whether the trial court erred in refusing to grant immunity to a defense witness.

III. Whether the jury instructions used for sentencing were inconsistent and confusing thereby providing inadequate standards for the jury to use in deciding between the death penalty and life imprisonment.

IV. Whether Cheadle is entitled to a new sentencing proceeding because one of the two aggravating circumstances submitted to the jury was not justified by the evidence.

V. Whether Cheadle's sentence of death should be set aside as excessive and/or disproportionate under the circumstances.

VI. Whether New Mexico's Capital Felony Sentencing Act, NMSA 1978, Sections 31–20A–1 through 31–20A–6 (Repl.Pamp. 1981), is unconstitutional because the death penalty is cruel and unusual punishment.

Leslie Goodwin (Goodwin) testified that on September 10, 1981, at approximately 2:15 a.m., she and Gabe Nava (Nava) left Ned's El Portal (Ned's), a bar in Albuquerque, New Mexico. They walked over to Nava's car and stood there in the parking

Janet Clow, Chief Public Defender, J. Thomas Sullivan, Appellate Defender, Santa Fe, for defendant-appellant.

Leo C. Kelly, Albuquerque, trial counsel.

Paul Bardacke, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

lot talking. Cheadle approached them branishing a gun. Cheadle stated, "Come on let's go, * * * I will kill you if you don't," and then by waving a silver-colored gun instructed them in which direction to proceed. After walking a short distance and stopping between buildings, Cheadle instructed Nava and Goodwin to stand facing the wall of the building in a "spread eagle" position with their backs to Cheadle. Cheadle then demanded money which they both gave to him. Nava was then instructed to take off his jeans and shirt, which he did. Nava and Goodwin were then ordered to move about ten to twelve feet down the alley. They moved to a fence, when again they were ordered to put their hands on the fence and stand in a "spread eagle" position. Cheadle then ordered Goodwin to remove her clothes. At about that time, Cheadle shot Nava for the first time. Cheadle again demanded that Goodwin remove her clothes and told her that he would kill her if she did not. She complied. Cheadle then attempted to rape Goodwin, but could not get an erection. Goodwin was then instructed to put her clothes back on. At that time, Cheadle shot Nava a second time. Cheadle ordered Goodwin back to Nava's car. Upon arriving at Nava's car, Cheadle then got into the front seat and reached over to unlock the driver's door for Goodwin. Goodwin ran and stopped a passing police car, explained what happened and gave a description of the offender to the police.

Nava died later that morning from gunshot wounds to the head.

## I. Identification Testimony.

### A. Out-of-Court Identification

Cheadle moved to "strike the identification of all the witnesses." The basis of the motion was that the identifications were unreliable because the witnesses had viewed Cheadle's picture furnished to the media by the police before they made the identification from a photographic lineup or the in-court identification. The trial court denied the motion.

■ The test with respect to suppression of out-of-court photographic identification is "whether the 'photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *State v. Nolan*, 93 N.M. 472, 476, 601 P.2d 442, 447 (Ct.App.), *cert. denied*, 93 N.M. 683, 604 P.2d 821 (1979) (citations omitted.) To determine this, we must decide whether under the "totality of the circumstances" the identification was reliable, even if the confrontation procedure was suggestive. *Manson, Correction Commissioner v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Nolan*. In *Manson, Correction Commissioner v. Brathwaite*, the United States Supreme Court set forth five factors to weigh in deciding whether out of court identification was suggestive:

1) The opportunity to view * * *.
2) The degree of attention * * *.
3) The accuracy of the description * * *.
4) The witness' level of certainty * * *.
5) The time between the crime and the confrontation * * *.

*Id.* at 114 & 115, 97 S.Ct. at 2253.

Four witnesses were shown a photographic array of five or six pictures which included Cheadle, after Cheadle's picture had been on television and in the newspaper, as the person responsible for Nava's killing.

■ We will first apply this test to Goodwin. Goodwin testified that she saw Cheadle's face clearly. Goodwin also testified that at times during the incident, she talked directly to Cheadle, face to face, at a distance of inches. Goodwin gave a description of the offender at the scene and later to Officer Putman of the Albuquerque Police Department, before the photographic identification. At the hospital, Goodwin was shown a photographic array which did not contain Cheadle's picture. Upon viewing the array, Goodwin told the police officer that the assailant was not among the pictures. The day following the incident, after she was released from the

hospital, two friends of Goodwin testified that they stopped by Goodwin's home. During a news broadcast, Goodwin saw Cheadle's picture on television. She told her friends, "Oh, my God that's him except he's got an afro in the picture." Goodwin immediately called the police station. Approximately six days later, Goodwin picked Cheadle's picture from a photographic array that contained a picture of Cheadle that was different from the one shown on television. At the trial, Goodwin made a positive in-court identification of Cheadle, as the man that killed Nava and attempted to rape her.

Julie Jones (Jones), a patron at Ned's the night of the incident, also identified Cheadle. Jones testified that Cheadle was sitting at the bar when Jones walked over to the bar to speak to Nava at approximately 1:15 a.m. Cheadle said something to her which she ignored. Jones, a hairdresser, remembers Cheadle particularly because of his slicked back hair style. On September 14, 1981, after seeing a picture of Cheadle on television, Jones picked Cheadle's picture from a photographic array. At trial, Jones positively identified Cheadle as being in Ned's the night of the incident. She also testified that when she picked Cheadle's picture from the photographic array, she was relying only on what she saw at Ned's the evening of the incident.

Ken Gaddis (Gaddis), the manager of Ned's, also identified Cheadle. Gaddis remembers Cheadle coming into Ned's around 1:00 a.m. the night of the incident. Ned's closes at 2:00 a.m., and Gaddis testified that he always starts noticing people around closing time. Gaddis testified that he remembers Cheadle's hair style and his eyes. Between the time of the incident and when he made his identification, Gaddis testified that he saw Cheadle's picture on television and in the newspapers approximately five times. On September 17, 1981, Gaddis was shown a photographic array which contained a picture of Cheadle different from the pictures shown on and in the media. Gaddis tentatively identified Cheadle from this photographic array. At the time of trial, Gaddis made a positive in-court identification of Cheadle as the person he saw in Ned's the night Nava was killed.

The last witness who identified Cheadle from a photographic array was Robert Mayes (Mayes). At trial, Mayes testified about and identified Cheadle as the person who came to his apartment a few days before the Nava murder, demanded money, and fired three shots at him with a chrome plated automatic pistol. Mayes identified Cheadle from a photographic array after Cheadle's picture appeared in the newspaper; however, he testified that his identification of Cheadle was from his own recognition concerning the night of the shooting at his apartment.

■ In determining whether there has been a violation of due process in the conduct of a confrontation, we must look to the totality of the circumstances. *State v. Torres*, 81 N.M. 521, 469 P.2d 166 (Ct. App.), *cert. denied*, 81 N.M. 506, 469 P.2d 151 (1970). After examining the record, we find that the trial court did not err in allowing the out-of-court identification testimony. *Manson, Correction Commissioner v. Bruthwaite; State v. Gilliam*, 83 N.M. 325, 491 P.2d 1080 (Ct.App.1971).

### B. In-Court Identification

■ In-court identification which is independent of and not tainted by the extra-judicial identification is admissible. *State v. Torres*. The in-court testimony from the record before us supports the trial court's ruling that it was independent.

Other witnesses who made in-court identifications of Cheadle without being shown photo arrays were: Jim Ewing, who was the doorman at Ned's the night of the incident, and remembers Cheadle coming in around midnight, showing his I.D. and paying the cover charge; and Hal Bereberg, a friend of Jim Ewing, who was approached by Cheadle outside Ned's after Ned's had closed.

■ After a review of the above identification testimony, we find that there was

no error by the trial court in denying the motion to suppress identification testimony, and the trial court correctly ruled that the in-court identification testimony was independent. *State v. Aguirre*, 84 N.M. 376, 503 P.2d 1154 (1972); *State v. Beachum*, 97 N.M. 682, 643 P.2d 246 (Ct.App.1981), *cert. quashed*, 98 N.M. 51, 644 P.2d 1040 (1982). Once a court finds that the evidence is admissible, it becomes a jury determination as to the accuracy of a witness' identification. *State v. Ortega*, 79 N.M. 744, 449 P.2d 346 (Ct.App.1968).

## II. Defense Witness Immunity.

At the close of presentation of the evidence, Cheadle moved to re-open his case, pursuant to NMSA 1978, Crim.P.Rule 40(j) (Repl.Pamp.1980), because a defense witness, John Archie (Archie), had been located. The trial court agreed to do so. Counsel was appointed for Archie because it appeared that his testimony could incriminate him for harboring a fugitive. NMSA 1978, § 30–22–4.

Outside the presence of the jury, Archie took the stand and indicated that if he was called to testify, he would only state his name and address. He would then invoke his Fifth Amendment privilege and refuse to answer questions. At this time, Cheadle made an offer of proof concerning what Archie would say if he took the stand, provided he was granted immunity. According to the offer of proof, Archie would testify that Cheadle spent the night of September 10, 1981, at Archie's house, and that the following day, while watching television at Archie's house, he first became aware that the police were looking for him. Therefore, Cheadle requested that the trial court on its own initiative grant Archie immunity. The trial court denied the request.

At the time of Cheadle's trial, New Mexico had two provisions that referred to immunity. NMSA 1978, Section 31–3A–1 (Cum.Supp.1981), applies to grand jury proceedings and is recompiled as Section 31–6–15, NMSA 1978 (Cum.Supp.1983). Section 31–6–15 states:

If a witness is granted immunity in return for evidence, none of his testimony or any evidence obtained as a fruit of his testimony shall be used against him in any criminal prosecution except that such person may be prosecuted for any perjury committed in such testimony or in producing such evidence, or for contempt for failing to give an answer or produce evidence.

NMSA 1978, Crim.P.Rule 58 (Repl.Pamp. 1980), sets forth the procedure for obtaining immunity for a witness. Rule 58 (emphasis added), provides in pertinent part:

(a) **Issuance of Order.** If a person has been or may be called to testify or to produce a record, document, or other object in an official proceeding conducted under the authority of a court or grand jury, the district court for the judicial district in which the official proceeding is or may be held may, *upon the written application of the prosecuting attorney, issue a written order requiring the person to testify or to produce the record, document, or* other *object notwithstanding his privilege against self-incrimination * * *.*

Since there is no constitutional provision or statute in this State allowing application for the granting of immunity to defense witnesses, we must follow the rule of criminal procedure set forth above. *State v. Sanchez*, 98 N.M. 428, 649 P.2d 496 (Ct. App.), *cert. denied*, 98 N.M. 478, 649 P.2d 1391 (1982); *Campos v. State*, 91 N.M. 745, 580 P.2d 966 (1978). Rule 58 requires a *written application by the district attorney and a written order by the trial court ordering the person to testify. State v. Sanchez.* This order must also contain a specific condition that New Mexico will forego the prosecution of the person for criminal conduct about which he is questioned and testifies. *Campos v. State.* The law requires the district attorney to undertake that obligation. *See* NMSA 1978, § 36–1–18(A) annot.

Cheadle made an oral request to the trial court for immunity, there was no written application. However, even if Cheadle had

complied with Rule 58, there is little precedent for granting defense witnesses immunity. Like New Mexico, the federal government allows prosecution witnesses to be immunized but does not have a rule or statute concerning the granting of immunity to defense witnesses. *See* 18 U.S.C. § 6002, § 6003, § 6005 (1976).

A majority of federal case law has held that the federal district court has no authority to grant immunity or to demand that the government seek immunity for a defense witness. *United States v. Hunter,* 672 F.2d 815 (10th Cir.1982); *United States v. Berrigan,* 482 F.2d 171 (3rd Cir.1973).

Cheadle relies on *Government of Virgin Islands v. Smith,* 615 F.2d 964 (3rd Cir. 1980), which suggests that under certain circumstances due process may require that the government afford immunity for a defense witness. The opinion sets forth four rules to follow:

1. The immunity must be properly sought in district court.

2. The defense witness must be available to testify.

3. The testimony must be clearly exculpatory and essential to the defendant's case.

4. There must be no strong government interest which countervails against a grant of immunity.

*Id.* at 972–973 (footnote omitted).

Even if this Court chose to adopt the decision in *Government of Virgin Islands v. Smith,* Cheadle did not comply with the four requirements. The request for immunity was not properly sought. The testimony was not clearly exculpatory and essential. Cheadle's offer of proof showed that Archie would testify that Cheadle slept at his residence the night of September 10, 1981. The murder of Nava was committed in the early morning of September 10, 1981.

■ However, we decline to follow *Government of Virgin Islands v. Smith* and hold that in New Mexico there is no authority to demand immunity for a witness by the defense. *See State v. Sanchez.*

The trial court properly denied Cheadle's request for granting immunity to Archie.

## III. Jury Instruction.

Cheadle claims that the jury instructions, NMSA 1978, UJI Crim. 39.30, 39.31, and 39.33 (Repl.Pamp.1982), were incomplete and confusing, thereby providing the jury with inadequate objective standards for weighing their decision as to whether death or life imprisonment was appropriate.

At the instructions' conference, the trial court asked both the State and Cheadle whether there were any objections to the proposed instructions to be given to the jury in the sentencing phase. Cheadle made no objections. On appeal, Cheadle, for the first time, objected to the giving of the three jury instructions.

■ We have repeatedly held that absent fundamental error that is jurisdictional, objections to jury instructions *cannot* be raised for the first time on appeal when the defendant did not object to the instructions at trial. *State v. Garcia,* 99 N.M. 771, 664 P.2d 969, *cert. denied,* — U.S. ——, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); *State v. Noble,* 90 N.M. 360, 563 P.2d 1153 (1977). We still adhere to this procedure in death penalty cases. *State v. Garcia; see Vaught v. State,* 410 So.2d 147 (Fla.1982).

We point out that in *State v. Garcia,* we reviewed two of the challenged instructions and found no fault with them. We also point out that the United States Supreme Court has recently held that there is no requirement that a state adopt specific standards for the weighing process in deciding whether to impose the death penalty. In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 258 (1983) (citations omitted) (emphasis added), the United States Supreme Court stated that:

[W]e note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravat-

ing and mitigating circumstances in exercising its discretion whether to impose the death penalty. * * * *[T]he Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances* * *.

■ Therefore, although New Mexico has adopted the standard that a defendant cannot be sentenced to death if the mitigating circumstances outweigh the aggravating circumstances, the Constitution does not require the adoption of a specific standard for instructing the jury in its consideration of aggravating and mitigating circumstances.

## IV. Aggravating Circumstances.

Cheadle was charged with two aggravating circumstances. N.M.S.A.1978, §§ 31–20A–5(B) and (G) (Repl.Pamp.1981). Both aggravating circumstances were submitted to the jury. The jury unanimously found beyond a reasonable doubt that aggravating circumstance Section 31–20A–5(B) existed and that Cheadle should be sentenced to death. The jury also unanimously found beyond a reasonable doubt that aggravating circumstance Section 31–20A–5(G) existed and that Cheadle should be sentenced to death for that crime also.

Cheadle does not dispute that there was sufficient evidence to sustain the submission of Section 31–20A–5(B) to the jury. Section 31–20A–5(B) provides that:

[T]he murder was committed with intent to kill in the commission of or attempt to commit kidnaping, criminal sexual contact of a minor or criminal sexual penetration.

Cheadle does assert that aggravating circumstance Section 31–20A–5(G) was not justified by the evidence; therefore, he should be granted a new sentencing proceeding. Section 31–20A–5(G) provides that:

[T]he capital felony was murder of a witness to a crime or any person likely to become a witness to a crime, for the purpose of preventing report of the crime or testimony in any criminal proceeding, or for retaliation for the victim having testified in any criminal proceeding.

The jury was instructed on "murder of a witness" as follows:

Before you may find the aggravating circumstance of murder of a witness to a crime or a person likely to become a witness to a crime, you must find that the state has proved to your satisfaction beyond a reasonable doubt each of the following elements:

1. Gabe Nava was a witness to a crime or likely to become a witness to a crime; and

2. Gabe Nava was murdered to prevent Gabe Nava from reporting the crime.

Accord, NMSA 1978, UJI Crim. 39.20 (Repl.Pamp.1981).

■ Cheadle raises this objection for the first time on appeal. Objections to jury instructions cannot be raised for the first time on appeal. State v. Garcia; Vaught v. State. Therefore, since this objection was not raised at the trial court level, Cheadle is precluded from raising it now. However, even if he were correct, when two or more aggravating circumstances are found, the invalidation of one will not invalidate the sentencing proceeding unless the invalidation is due to constitutionally protected conduct. Zant v. Stephens.

## V. Proportionality Review.

A deeply rooted principle is that a punishment should be proportionate to the crime. Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). If not, then the punishment is considered cruel and unusual in violation of the United States and New Mexico Constitutions. U.S. Const. amend. VIII and XIV; N.M. Const. art. II, § 13. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), held that the imposition of the death penalty for a deliberate murder is neither the purposeless imposition of severe pun-

ishment nor punishment grossly dispropor-tionate for the crime.

Under New Mexico's Capital Felony Sentencing Act, Section 31–20A–4(C), we are to review the sentence of death to determine if it is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In *State v. Garcia* 99 N.M. at 780, 664 P.2d at 978 (1982), we set up guidelines for such review.

These guidelines are to apply prospectively to cases that were decided in any court within New Mexico after the mandate in *State v. Garcia.* Because Cheadle's case was already before this Court when *State v. Garcia* was decided, we contacted the State and the defense requesting their submission of cases for comparisons. Two cases have been brought to our attention. *State v. Hutchinson,* 99 N.M. 616, 661 P.2d 1315 (1983), and *State v. Garrison,* No. 14,313. We will also consider the recently decided cases of *State v. Simonson,* 22 SBB 1125 (1983), and *State v. Gilbert,* 22 SBB 1173 (1983).

In *State v. Hutchinson,* the defendant was charged with aggravating circumstances Section 31–20A–5(B) and (G). The jury found both aggravating circumstances existed, but did not impose the death sentence. Hutchinson was convicted of first degree murder for which he received life imprisonment, of first degree kidnapping for which he received eighteen years imprisonment, and of armed robbery for which he received nine years imprisonment.

Cheadle urges us to also compare *State v. Garrison,* No. 14,313, which was disposed of by unpublished decision. Garrison was charged with one aggravating circumstance. § 31–20A–5(G). The jury *did not* find that this aggravating circumstance existed. Therefore, pursuant to our standard in *State v. Garcia, State v. Garrison* is not to be compared and is not applicable to this analysis.

In *State v. Simonson,* aggravating circumstance Section 31–20A–5(G) was given for two separate murders. The jury found that each aggravating circumstance existed but after weighing the mitigating and aggravating circumstances and considering the defendant and the crime, the jury did not impose the death penalty. Simonson was convicted of two counts of first degree murder for which he received two life sentences, and he was also convicted of attempted murder for which he received nine years.

In *State v. Gilbert,* aggravating circumstance Section 31–20A–5(B) was given for two separate murders. Section 31–20A–5(G) was also given. The jury found that all three aggravating circumstances existed and unanimously voted to impose the death penalty. Gilbert's death penalty was recently upheld. *State v. Gilbert.*

██ Proportionality review in New Mexico is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant. *State v. Garcia.* It is our duty to review the determination by the jury; we will not retry the case for what may be a better result. *Id.*

██ We have compared the sentences imposed in *Hutchinson, Simonson* and *Gilbert* to see if Cheadle's sentence is excessive or disproportionate. The facts, circumstances and crimes in each case are different, as well as the defendants and their histories. After a thorough review of the record and transcripts in Cheadle's trial, we find that Cheadle's sentence of death for the deliberate murder of Nava is neither excessive nor disproportionate.

## VI.  Death Penalty.

Cheadle contends that the death penalty constitutes cruel and unusual punishment under the United States' and New Mexico's Constitutions. U.S. Const. amend. VIII and XIV; N.M. Const., art. II, § 13.[1]

1. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), held that the Eighth Amendment to the United States Constitution was applicable to the states through the Fourteenth Amendment to the United States Constitution.

In *State v. Garcia*, we held that pursuant to *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the punishment of death does not violate the United States Constitution. We also held in *State v. Garcia*, that pursuant to *State v. Rondeau*, 89 N.M. 408, 553 P.2d 688 (1976), the death penalty is not cruel and unusual punishment *per se* within the prohibition of the Eighth and Fourteenth Amendment of the United States Constitution or Article II, Section 13 of New Mexico's Constitution. New Mexico's current capital punishment statutes, Sections 31–20A–1 through 31–20A–6, are modeled after Florida's, Georgia's and Texas'[2] death penalty statutes, which havewithstood United States Supreme Court scrutiny.[3] Therefore, we again find that New Mexico's Capital Felony Sentencing Act is constitutional.

## VII. Conclusion.

After having carefully reviewed the record and transcript in the case before us, we conclude that there was no error committed on the issues presented in this case and that the death sentence was validly imposed. Therefore, the judgment of the jury that Cheadle be punished by death is affirmed. This case is remanded to the trial court to set the date of execution, not less than sixty days nor more than ninety days from the issuance of the mandate on our judgment.

IT IS SO ORDERED.

PAYNE, C.J., and FEDERICI, J., concur.

SOSA, Senior Justice, dissenting in part.

STOWERS, not participating.

SOSA, Senior Justice, specially concurring.

I concur with the affirmance of the convictions in this case for the reasons stated in the majority opinion. I respectfully dissent on the issue of the imposition of the death penalty. I would hold that the Capital Felony Sentencing Act, NMSA 1978, Sections 31–20A–1 through 31–20A–6 (Repl.Pamp.1981) violates the Fourteenth and Eighth Amendments to the U.S. Constitution and Article II, Sections 13 and 18 of the N.M. Constitution. Initially, the relevant Uniform Jury Instructions do not provide clear and objective standards to guide the jury's sentencing decision. While the defendant and the crime may only be considered in mitigation, and not in aggravation, the jury is not instructed to this effect. This belies the fact that no effective guidance is provided the jury in its determination whether aggravating circumstances outweigh mitigating circumstances. In addition, the New Mexico death penalty provisions do not provide for meaningful proportionality review as is evidenced by the cursory discussion in the majority opinion comparing the circumstances, crimes, defendant's history and sentences in the instant case with those of other cases. Finally, both the Uniform Jury Instructions and the sentencing statute allow for unequal treatment of equally culpable defendants. For these reasons, which I discuss in greater detail in my specially concurring opinion in *State v. Garcia*, 99 N.M. 771, 664 P.2d 969, *cert. denied*, —— U.S. ——, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983), I would remand this cause for the imposition of a sentence of life imprisonment.

---

2. Fla.Stat. § 921.141 (1981); Ga.Code Ann. § 27–2534.1 and § 27–2537 (Cum.Supp.1982); Texas Stat.Ann. art. 37.071 (Vernon 1981).

3. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).