# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-003

Filing Date: December 21, 2017

Docket No. S-1-SC-35629

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

ALEJANDRO RAMIREZ,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
John A. Dean, Jr., District Judge

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

McGarry Law Office
Kathleen McGarry
Glorieta, NM

for Appellant

## OPINION

**NAKAMURA, Chief Justice.**

**{1}** A jury found that Defendant Alejandro Ramirez shot and killed Johnny Vialpando. Ramirez was convicted of several offenses, including first-degree murder, and the district court sentenced Ramirez to life imprisonment plus an additional sixty-five and one-half years. Ramirez appeals directly to this Court. He asserts that (1) there was insufficient evidence presented to support his convictions; (2) his right to due process was violated when the district court permitted several eyewitnesses to identify him in court as the shooter; and (3) his convictions violated the double-jeopardy guarantee against multiple punishments.

1

**{2}** We hold that the evidence is sufficient to support the convictions, the district court did not violate Ramirez's right to due process by allowing the in-court identifications, and double jeopardy precluded the district court from convicting Ramirez of first-degree murder and shooting at a motor vehicle. We examine the unit of prosecution for child abuse by endangerment as a matter of first impression and hold that Ramirez's multiple child abuse convictions are statutorily authorized. Consequently, we vacate only the shooting-at-a-motor-vehicle conviction and remand to the district court for resentencing.

## I. BACKGROUND

**{3}** Vialpando was shot nine times while sitting in a vehicle with his spouse and three children and died from the injuries he sustained. The State charged Ramirez with one count of first-degree murder, NMSA 1978, § 30-2-1(A)(1) (1994); one count of conspiracy to commit first-degree murder, NMSA 1978, § 30-28-2 (1979), § 30-2-1(A)(1); one count of shooting at or from a motor vehicle, NMSA 1978, § 30-3-8(B) (1993); three counts of child abuse, NMSA 1978, § 30-6-1(D) (2009); one count of tampering with evidence, NMSA 1978, § 30-22-5 (2003); one count of aggravated assault with a deadly weapon, NMSA 1978, § 30-3-2(A) (1963); and one count of possession of a firearm by a felon, NMSA 1978, § 30-7-16 (2001). Ramirez pleaded not guilty to all of these charges.

**{4}** At Ramirez's trial, five eyewitnesses testified that Ramirez was the gunman who shot and killed Vialpando, and he was found guilty on all counts. The State abandoned the felon-in-possession-of-a-firearm count. The district court entered convictions on the remaining counts and sentenced Ramirez. Article VI, Section 2 of the New Mexico Constitution grants us exclusive jurisdiction over his appeal.

## II. DISCUSSION

### A. Sufficiency of the Evidence

**{5}** Ramirez contends that the State failed "to present sufficient evidence from which the jury could have found beyond a reasonable doubt that [he] committed the crimes . . . ." Ramirez makes several specific claims as to how the evidence was insufficient. We address these arguments in turn but begin by stating the standards that govern our review.

**{6}** When reviewing a jury's verdict for sufficient evidence, this Court determines whether substantial evidence, either direct or circumstantial, exists to support every element essential to a conviction beyond a reasonable doubt. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057. "Evidence is viewed in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). This Court will not second-guess the jury's decision concerning the credibility of witnesses, reweigh the evidence, or substitute its judgment for that of the jury. *Id.* "So long as a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction, [this

Court] will not upset a jury's conclusions." *Id.* (internal quotation marks and citations omitted).

## 1. Identity evidence

**{7}** Ramirez contends that "the evidence of identity is insufficient in this case." He claims that the jury could not have found beyond a reasonable doubt that he was the shooter as the eyewitness testimony was "unreliable." Because there was no reliable evidence to prove that he was the shooter, Ramirez asserts, the first-degree murder conviction—and any other conviction necessarily predicated on the fact that he was the individual who shot Vialpando—"cannot stand." We reject this line of argument.

**{8}** Vialpando's wife, Rhiannon, offered the following testimony at trial. The day of the shooting was sunny. In the moments immediately before the shooting, she was seated in the driver's seat of her Dodge Durango. Vialpando was in the front passenger's seat. Two of the children, Carmen and Nikki, sat in the back seat. Carmen sat directly behind Vialpando. The third child, Michael, sat in the third row of seats. As Rhiannon was preparing to back out of their parking spot at the Animas Mall in Farmington, New Mexico, a man she had not seen before approached the front passenger-side window of the Durango and began speaking to Vialpando. As he talked to Vialpando, the man looked around, avoided eye contact with Vialpando, and texted on his cell phone. The conversation lasted approximately five minutes. The man was very small, Hispanic, and had shoulder-length, curly hair. She asked Vialpando, "Who is this?" Vialpando replied, "Little Alex." Little Alex asked for a ride, but she said no. A white Chevy Blazer abruptly pulled in behind the Durango and blocked it from moving. Little Alex indicated that his brother was the driver of the Blazer and then walked to the driver's side of the Blazer, spoke with the driver, and received an object from the driver. Little Alex then walked quickly back to the passenger side of the Durango, said "This is for Gary," and began firing a gun at Vialpando. While the shooting took place, she was only four feet from Little Alex. She identified Ramirez as "Little Alex." This was the second time Rhiannon had identified Ramirez as the shooter. She first identified him as the shooter at a preliminary hearing "a week or two" after the shooting.

**{9}** Officer Heather Chavez testified at trial that Gary Martinez was murdered in a drive-by shooting in Farmington in 2008. Vialpando was a person of interest in the murder because he had a vehicle similar to the one used to commit the crime; however, he was never charged and the homicide remains unsolved.

**{10}** Carmen, Nikki, and Michael also testified at trial. Carmen was sixteen at the time of Vialpando's murder. She described the man who spoke with and shot Vialpando as small with long hair. She was so near to this man that if she had rolled down her window she could have touched him. She had a "very clear" look at this man when the shooting began. She identified Ramirez as the man who spoke with and shot Vialpando. Like Rhiannon, Carmen also heard Ramirez say "This is for Gary" immediately before Ramirez shot Vialpando. During cross-examination, Carmen admitted that she had seen photographs of

3

Ramirez in the newspaper but explained that she had also "seen him with [her] eyes." Nikki, who was fourteen at the time of the shooting, and Michael, who was eleven at the time of the incident, both also identified Ramirez as the person who conversed with and then shot Vialpando.

{11}     Shanley Lujan, a bystander, offered the following account of the murder. She was sitting in her car at the time of the shooting, and Vialpando was shot right in front of her. She described the man who spoke with and then shot Vialpando as Hispanic with wavy, shoulder-length hair. She identified Ramirez as the shooter. After the shooting, she saw Ramirez enter a white SUV that had blocked the Durango in and watched the SUV speed away "crazy fast."

{12}     The following additional evidence was presented to the jury. Ramirez is relatively small—he is five feet two inches tall and weighs 110 pounds—and was this height and weight at the time of the shooting. For a man, his hair is longer than average. State investigators recovered a latent print of Ramirez's palm near the window's edge of the front passenger-side door of the Durango. Ramirez owned a white Chevy Blazer at the time of the shooting, and shortly after the shooting, he was arrested in a white Chevy Blazer. After Ramirez was apprehended, the police observed that he had an injury on his left hand, near the webbing of the fingers. Ramirez is left-handed. When a person fires a semiautomatic gun, it will recoil. If the shooter lacks a strong grip, the gun will rotate and, upon recoil, the hammer or the slide might injure the shooter's hand. On the day of the shooting, Shane Fletcher, a flooring installer, recovered a gun not far from where police officers first encountered the Chevy Blazer. That gun was retrieved by law enforcement and was identified as a Czechoslovakian semiautomatic pistol with an external hammer that could strike the skin when discharged. A firearms expert testified that the bullets and casings recovered at the crime scene were fired from this gun.

{13}     This evidence more than adequately establishes Ramirez's identity as the person who shot Vialpando. *See State v. Hunter*, 1933-NMSC-069, ¶ 6, 37 N.M. 382, 24 P.2d 251 ("[T]he testimony of a single witness may legally suffice as evidence upon which the jury may found a verdict of guilt."). Ramirez's contention that the first-degree murder charge is not supported by sufficient evidence because the eyewitness testimony is "unreliable" is unavailing. The jury was free to accept or reject the eyewitness accounts. *See State v. McAfee*, 1967-NMSC-139, ¶ 8, 78 N.M. 108, 428 P.2d 647 ("It was for the jury to determine the weight to be given the testimony and determine the credibility of the witnesses[.]" (citations omitted)). Similarly, Ramirez achieves very little by emphasizing the evidence presented at trial in support of his theory that he was not the shooter. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**2.     Tampering with evidence**

4

**{14}**     Ramirez contends that there was insufficient evidence offered to support his conviction for tampering with evidence because "[t]he State never tied the weapon to Alejandro Ramirez." This argument fails. As we have already explained, there was sufficient evidence offered to support the jury's determination that Ramirez was the shooter. The following additional evidence connects Ramirez to the gun used to kill Vialpando.

**{15}**     A gun was recovered not far from where police officers first encountered Ramirez in the Chevy Blazer. This gun fired the bullets that killed Vialpando and discharged the casings found at the crime scene. From this evidence, the jury was free to infer that Ramirez discarded this gun after killing Vialpando and fleeing the scene. *See State v. Carrillo*, 2017-NMSC-023, ¶ 46, 399 P.3d 367 (rejecting the defendant's sufficiency challenge to tampering with evidence and observing that the jury could logically deduce or infer, from the facts presented, that the defendant hid or otherwise disposed of a gun to prevent apprehension, prosecution, or conviction).

### 3.     Shooting at a motor vehicle

**{16}**     Ramirez argues that there was "insufficient evidence to prove that [he] was guilty of shooting at a motor vehicle." Because we conclude in a subsequent section of this opinion that the shooting-at-a-motor-vehicle conviction must be vacated on double jeopardy grounds, we need not address this sufficiency claim.

### 4.     Child abuse

**{17}**     Ramirez asserts that there was insufficient evidence presented to support the child abuse convictions because "none of the three children were physically harmed in any way" and "there was no evidence to support that [he] intended to harm any of the children." Ramirez does not question the validity of the child abuse jury instruction. *See State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 ("[T]he [j]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (alterations in original) (internal quotation marks and citation omitted)). The instruction did not require the jury to find that Ramirez intended to harm the children or that Ramirez actually physically harmed the children. Rather, the instruction required the jury to find that Ramirez "caused [the child] to be placed in a situation that endangered the life or health of [the child]" and that "Ramirez showed a reckless disregard for the safety or health of [the child]."

**{18}**     The jury heard evidence that Ramirez fired a gun at Vialpando nine times at point-blank range, that Vialpando was seated in the front passenger seat of the Durango, and that the children were sitting in the back seats of the Durango in immediate proximity to Vialpando. The jury also learned that, although Vialpando was shot nine times, only five of the bullets were found inside of his body. Several of the bullets Ramirez fired traveled through Vialpando and continued onward. One of those bullets traveled through the driver's-side window in the second row of seats of the Durango and another bullet was recovered from the headliner or inside roof of the Durango. From this evidence, the jury

could reasonably infer that it was sheer luck that the children were not struck by one of the bullets Ramirez fired at Vialpando. Thus, we have no doubt that the evidence presented is sufficient to support the jury's determination that Ramirez placed the three children in a situation that endangered their lives and that Ramirez showed a reckless disregard for their safety and health.

### 5.    Aggravated assault

**{19}**    Ramirez contends that "[t]here was insufficient evidence to prove that [he] committed aggravated assault against [Rhiannon] Vialpando." He makes two arguments to support this claim. First, Ramirez contends that the evidence was insufficient because the State did not establish that Ramirez pointed the gun at Rhiannon or fire it in her direction and, because he did not point the gun in her direction, Rhiannon's "'fear' for *her life* was not reasonable." Second, he argues that "there was no evidence that the shooter willfully and intentionally assaulted [Rhiannon] Vialpando." We reject both arguments.

**{20}**    The jury was instructed that, to find Ramirez guilty of aggravated assault, they had to find that Ramirez "discharged a firearm in the direction of Rhiannon Vialpando," that this "conduct caused Rhiannon Vialpando to believe [that Ramirez] was about to intrude on Rhiannon Vialpando's bodily integrity or personal safety by touching or applying force to Rhiannon Vialpando in a rude, insolent or angry manner," and that "[a] reasonable person in the same circumstances as Rhiannon Vialpando would have had the same belief." The jury so found and the evidence was sufficient to support this finding.

**{21}**    Ramirez's contention that there was no evidence to suggest that the firearm was aimed in Rhiannon's direction arises from a formalistic and conceptually flawed understanding of what it means to "discharge[] a firearm in the direction of" someone. Ramirez fired nine shots into the front passenger-side window of the Durango. Rhiannon was seated in the driver's seat of the Durango. When the shooting began, Rhiannon grabbed Vialpando's arm and closed her eyes. She believed that she and all of her family would die.

**{22}**    A shooting conducted in very close quarters endangers anyone in proximity to the intended target. In other words, when Ramirez pointed the gun at Vialpando, he was simultaneously pointing it "in the direction of" Rhiannon. To conclude otherwise would require us to accept Ramirez's argument that Rhiannon's fear for her life and safety during the shooting was unreasonable as she was not the intended target. This we will not do. The evidence presented was sufficient to support the jury's determination that Ramirez fired a gun in Rhiannon's direction, that Rhiannon believed she was in danger of receiving an immediate battery and that this belief was reasonable. *See* § 30-3-1(B).

**{23}**    This Court's decision in *State v. Manus* disposes of Ramirez's second argument—that there was no evidence he willfully and intentionally assaulted Rhiannon. 1979-NMSC-035, ¶¶ 12-14, 93 N.M. 95, 597 P.2d 280, *overruled on other grounds by Sells v. State*, 1982-NMSC-125, ¶¶ 9-10, 98 N.M. 786, 653 P.2d 162. In *Manus*, an officer had

arrested Mrs. Manus in front of the Manus home. *Id.* ¶ 3. While a bystander was helping the officer complete an accident report, Mr. Manus emerged from the home wielding a loaded gun. *Id.* ¶ 5. Mr. Manus pointed the gun in the direction of the officer and bystander and shot and killed the officer. *Id.* The jury convicted Mr. Manus of aggravated assault against the bystander. *Id.* ¶ 1. We affirmed that conviction and held that the state was not required to prove that Mr. Manus specifically intended to assault the bystander but only that Mr. Manus had committed an unlawful act with general criminal intent that caused the bystander to believe that she was in danger of receiving an immediate battery. *Id.* ¶ 14; *see also State v. Branch*, 2016-NMCA-071, ¶ 16, 387 P.3d 250 ("Liability under the statute is only limited by the requisite mental state of conscious wrongdoing and by the requirement that the victim's fear must be reasonable."). Ramirez acknowledges that the mens rea element necessary to establish aggravated assault is general criminal intent, i.e., conscious wrongdoing. Ramirez's second argument fails. There was sufficient evidence to support Ramirez's aggravated assault conviction.

## B.      Suppression of the Identification Testimony

**{24}**     Prior to trial, Ramirez filed a motion requesting suppression of "all out-of-court identifications" and "all in-court identifications" by "any alleged eye witness." Ramirez argued that there was a "grave danger" the anticipated eyewitnesses would offer "irreparable misidentification[s]," a result that Ramirez claimed would be a "miscarriage of justice" and "a violation of [his right to] due process." Ramirez's motion also requested that the court conduct a hearing on these matters. The district court rejected Ramirez's arguments and denied the motion. On appeal, Ramirez argues that the district court should have granted the motion, that in failing to do so it denied him his right to due process, and that this error is grounds for reversal of his convictions. We are not persuaded, and to explain why we must first carefully examine the arguments presented to the district court.

**{25}**     Ramirez asserted in district court that the eyewitness accounts of the shooting served as the foundation for the charges against him and that those eyewitness accounts are "unreliable" and "inadmissible." They are unreliable and inadmissible, he argued, because "any in-court identification by any alleged eyewitness is tainted by the out-of-court identification . . . ." Ramirez in turn asserted that "the out-of-court identification procedures used . . . were so impermissibly unreliable as to give rise to a very substantial likelihood of irreparable misidentification." Ramirez pointed out that "[n]o witness was provided with an opportunity to participate in a show-up, line-up, photo array or other type of identification proceeding following their initial observation at the time of the shooting." Ramirez also pointed out that Rhiannon identified him as the shooter at the preliminary hearing.

**{26}**     It seems Ramirez intended to convey that the *absence* of out-of-court identification procedures together with the fact that Rhiannon was poised to testify that she had previously identified him as the shooter at a preliminary hearing might somehow taint the eyewitnesses' trial testimony and lead the eyewitnesses to identify him as the shooter regardless of whether or not they actually saw him shoot Vialpando. This outcome seemed all too likely, or so

7

Ramirez claimed, given the lengthy span of time between the shooting and trial—a period of more than two years—during which memories of the features of the shooter would have faded. This understanding of the arguments appears to be precisely how the district court construed them, and the court was unpersuaded.

**{27}** The district court rejected Ramirez's claim that law enforcement's decision to abstain from engaging in any form of out-of-court identification procedure could somehow taint the anticipated in-court identifications. Where there is no out-of-court identification procedure, the court reasoned, that nonexistent procedure cannot taint later in-court identifications. Similarly, the court dismissed Ramirez's contention that permitting Rhiannon to testify at trial about her in-court identification at a preliminary hearing might somehow taint the other anticipated in-court identifications at trial. In the court's view, these claims had no bearing on the admissibility of the anticipated eyewitness testimony but were actually arguments directed at the weight Ramirez believed the jury should give the identifications. The court determined that "[a]ny weakness in the testimony can be revealed during cross-examination. It is the function of the jury as fact finder, not this Court as a gatekeeper, to determine the credibility and reliability of trial witnesses." In the end, the district court permitted Rhiannon, the three children, and Lujan to give eyewitness testimony at trial. They all identified Ramirez as the shooter. Rhiannon was also permitted to testify that she had earlier identified Ramirez as the shooter at a preliminary hearing.

**{28}** On appeal, Ramirez asserts that the court erred in permitting the in-court identifications, but the focus of his arguments has changed. He continues to assert that the in-court identifications were "tainted" but now emphasizes that media reports in the aftermath of the shooting indicated that he was the suspected shooter, and he argues that these reports necessarily tainted the eyewitnesses' identifications. He asserts that "[t]he fact that the taint was not caused by the police, does not lessen the problem in this day of instant social media." He also contends that the very fact that the in-court identifications happened in a courtroom is significant. Witnesses, Ramirez points out, know where the defendant sits and who he is. Ramirez further suggests that his ethnicity and gender are significant. He notes that he was the only Hispanic male seated in the area of the courtroom reserved for attorneys. For these reasons, Ramirez claims that the eyewitness identifications at trial were the product of suggestion, are unreliable, and, thus, permitting the eyewitnesses to offer the identification testimony violated his right to due process.

**{29}** Because Ramirez argues that the district court's decision to deny his motion to suppress violated his right to due process, our review is de novo. *See State v. Belanger*, 2009-NMSC-025, ¶ 8, 146 N.M. 357, 210 P.3d 783 ("This appeal implicates . . . the Fourteenth Amendment right to due process of law, including the right to a fair trial, and therefore our review is de novo.").

**{30}** Our treatment of the issue presented by Ramirez is guided by *Perry v. New Hampshire*, 565 U.S. 228 (2012). *See United States v. Thomas*, 849 F.3d 906, 910 (10th Cir. 2017) (acknowledging the debate whether *Perry* "overruled circuit-level precedent requiring

8

inquiries into the suggestiveness and reliability of in-court identifications" and embracing the conclusion that "*Perry* applies not only to pretrial identifications but also to in-court identifications"), *cert. denied*, *Thomas v. United States*, ___ S.Ct. ___, 2017 WL 2363067 (U.S. Oct. 10, 2017). The defendant in *Perry* challenged the admissibility of a prejudicial out-of-court identification that was not arranged by the police and argued that due process required the trial court to assess the reliability of *any* eyewitness identification made under suggestive circumstances. 565 U.S. at 232-33, 240-41. The Court rejected this argument and held that due process "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. In reaching this conclusion, the *Perry* Court surveyed the existing body of case law regarding the admissibility of eyewitness identifications.

**{31}** *Perry* noted that in *Manson v. Brathwaite*, 432 U.S. 98 (1977), and *Neil v. Biggers*, 409 U.S. 188 (1972), the Court set forth an approach to determine whether due process requires suppression of eyewitness identification. *See Perry*, 565 U.S. at 238. *Perry* clarified that this approach embraces a crucial precondition: "due process concerns arise *only* when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 238-39 (emphasis added); *see also id.* at 241 ("The due process check for reliability . . . comes into play *only* after the defendant establishes improper police conduct." (emphasis added)). *Perry* further clarified that, under the line of precedent beginning with *Stovall v. Denno*, 388 U.S. 293 (1967), "the Court has linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Perry*, 565 U.S. at 242; *see also State v. Flores*, 2010-NMSC-002, ¶ 56, 147 N.M. 542, 226 P.3d 641 (acknowledging authority limiting suppression of in-court identifications to only those cases where the in-court identification "follows an allegedly suggestive pretrial encounter" that itself resulted "from some type of government action." (quoting Lynn M. Talutis, *Admissibility of In-Court Identification as Affected by Pretrial Encounter That Was Not Result of Action by Police, Prosecutors, and the Like*, 86 A.L.R. 5th 463 (2001))).

**{32}** The in-court, eyewitness identifications here were not the result of impermissible, suggestive, pretrial, law-enforcement-orchestrated procedures. No such procedures occurred. Indeed, to ensure that Ramirez was not unfairly prejudiced, the police abandoned a planned, pretrial photographic lineup when they discovered that the media had already published photos of Ramirez. Ramirez's own eyewitness identification expert testified that the police acted properly by not proceeding with the lineup.

**{33}** Ramirez's contention that it does not matter that the alleged taint in his case arose from media coverage rather than improper police influence is simply incorrect. The source of the alleged taint does matter. It is only when law enforcement are the source of the taint that due process concerns arise.

**{34}** Ramirez's objection to the fact that the in-court identifications occurred in a

9

courtroom, his claim that his seat position in the courtroom and his ethnicity and gender were all suggestive, and his argument that the eyewitnesses' memories of the features of the shooter likely faded given the delay between the offense and trial are all equally unavailing. These facts do nothing to establish that the alleged taint, if there was any, arose as a consequence of improper law enforcement influence. *See Thomas*, 849 F.3d at 911 (rejecting the argument that an in-court identification was unduly suggestive because the defendant was the only African-American man at counsel table, the eyewitness had never been asked to identify the robber, and the in-court identification occurred more than nineteen months after the crime, as these are not circumstances attributable to improper law enforcement conduct). To the extent Ramirez means to criticize identification testimony more broadly as an inherently problematic and unreliable form of evidence, his attack necessarily fails in light of the discussion in *Perry*.

**{35}**   *Perry* recognized that "[m]ost eyewitness identifications involve some element of suggestion[; i]ndeed, all in-court identifications do[,]" and acknowledged that "the annals of criminal law are rife with instances of mistaken identification." 565 U.S. at 244-45 (internal quotation marks and citation omitted). Nevertheless, *Perry* concluded that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing a jury to assess its creditworthiness." *Id.* at 245. Moreover, *Perry* emphasized that other constitutional safeguards provide a criminal defendant sufficient protection against any fundamental unfairness resulting from eyewitness identifications. *Id.*; *cf. State v. Cheadle*, 1983-NMSC-093, ¶ 15, 101 N.M. 282, 681 P.2d 708 ("Once a court finds that the evidence is admissible, it becomes a jury determination as to the accuracy of a witness' identification."), *overruled on other grounds by Belanger*, 2009-NMSC-025, ¶ 36. These include the right to have a jury evaluate the testimony of witnesses, the right to confront eyewitnesses, the right to the effective assistance of an attorney who can expose the flaws of eyewitness testimony on cross-examination and focus the jury's attention on such flaws during opening and closing arguments, the right to present testimony about the unreliability of eyewitness identification made under certain circumstances, and the requirement that the state prove guilt beyond a reasonable doubt. *Perry*, 565 U.S. at 245-47. Ramirez utilized and benefitted from these various safeguards at his trial.

**{36}**   Ramirez deftly cross-examined those witnesses who made in-court identifications and drew attention to the potential unreliability of their accounts of the shooting. And as noted, he also called an expert witness in eyewitness identification and eyewitness identification procedure. That expert testified about the circumstances of memory formation, retention, recall, and maintenance; the conditions that render procedures of identification more or less reliable; the role of available media depictions as independent sources in the formation of memory and the consequent effect on the reliability of subsequent eyewitness identifications; and the unreliability of in-court eyewitness identifications, both generally and in this case. Ramirez's jury was thoroughly informed about the shortcomings of eyewitness testimony when it considered the specific eyewitness testimony presented at Ramirez's trial and determined that Ramirez was the person who shot and killed Vialpando.

**{37}** For these reasons, we hold that the district court did not err when it denied Ramirez's motion to suppress all out-of-court and in-court identifications. Nor did it err in denying Ramirez a hearing on the question of the admissibility of the identifications.

## C. Double Jeopardy

**{38}** "The Double Jeopardy Clause of the Fifth Amendment, enforced against the states by the Fourteenth Amendment, protects defendants from receiving multiple punishments for the same offense." *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). The protection this clause provides, however, is limited. "[T]he only function the Double Jeopardy Clause serves in cases challenging multiple punishments is to prevent the prosecutor from bringing more charges, and the sentencing court from imposing greater punishments, than the Legislative Branch intended." *Herron v. State*, 1991-NMSC-012, ¶ 6, 111 N.M. 357, 805 P.2d 624 (emphasis, internal quotation marks, and citations omitted).

**{39}** "There are two classifications of double jeopardy multiple-punishment cases." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. "The first is the double-description case, where the same conduct results in multiple convictions under different statutes." *Id.* "The second is the unit-of-prosecution case, where a defendant challenges multiple convictions under the same statute." *Id.* Ramirez makes both types of double jeopardy multiple-punishment challenges.

### 1. Double-description claims

**{40}** Ramirez first argues that this Court should vacate the shooting-at-a-motor-vehicle count because it violates double jeopardy under a double-description theory. The State concedes that Ramirez is correct and that the shooting-at-a-motor-vehicle conviction must be vacated because it was subsumed by the first-degree murder charge. *State v. Montoya*, 2013-NMSC-020, ¶¶ 2, 54, 306 P.3d 426. We agree that Ramirez's conviction for shooting at a motor vehicle must be vacated.

**{41}** Ramirez next makes a cursory double-description challenge to his convictions for both child abuse and aggravated assault. He contends that these counts should also be merged into the first-degree murder charge. We reject this claim.

**{42}** Double-description challenges are subject to the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶¶ 25-34, 112 N.M. 3, 810 P.2d 1223. Under that inquiry, this Court must determine whether the conduct underlying the multiple offenses was unitary and whether, considering the statutes at issue, the Legislature intended to create separately punishable offenses. *Id.* ¶ 25. Ramirez cannot carry the burden imposed by the second prong of the *Swafford* test. The Legislature intended to punish the separate crimes of child abuse, aggravated assault, and murder separately.

11

**{43}** "If each statute requires proof of a fact that the other does not, it may be inferred that the Legislature intended to authorize separate punishments under each statute." *Swick*, 2012-NMSC-018, ¶ 13 (citing *Swafford*, 1991-NMSC-043, ¶ 12). Comparing the elements of the three statutes at issue, each statute requires proof of a fact that the other two statutes do not require. *Compare* § 30-2-1(A)(1) (requiring the State to prove a deliberate intent to kill), *with* § 30-3-2(A) (requiring the state to prove that the offender's conduct caused the victim to believe that the defendant was about to intrude on the victim's bodily integrity or personal safety by touching or applying force to the victim in a rude, insolent, or angry manner), *and* § 30-6-1(D) (requiring the state to prove that the offender placed a child in a situation that endangered the child's life). Other indicia of legislative intent also suggest that the Legislature intended to punish these crimes separately. *See Swafford*, 1991-NMSC-043, ¶ 31 (clarifying that "if the elements of the statutes are not subsumed one within the other, then the *Blockburger* test raises only a presumption that the statutes punish distinct offenses . . . [which] may be overcome by other indicia of legislative intent" like "the language, history, and subject of the statutes"). Here, the three statutes are quite different and address distinct social evils. The presumption by the *Blockburger* strict-elements test is not overcome. Ramirez's double-description challenges to the child-abuse and aggravated-assault convictions fail.

## 2.      Unit of prosecution

**{44}** Ramirez also argues that the separate punishments for the three counts of child abuse by endangerment violate double jeopardy under a unit-of-prosecution theory. He contends that the three counts should have merged into one single count. For the reasons that follow, we reject this argument.

### a.      Controlling legal standards

**{45}** In a unit-of-prosecution case, "the defendant has been charged with multiple violations of a single statute based on a single course of conduct. The relevant inquiry . . . is whether the legislature intended punishment for the entire course of conduct or for each discrete act." *Swafford*, 1991-NMSC-043, ¶ 8. "[T]he only basis for dismissal is proof that a suspect is charged with more counts of the same statutory crime than is statutorily authorized." *State v. Bernal*, 2006-NMSC-050, ¶ 13, 140 N.M. 644, 146 P.3d 289. "The issue, though essentially constitutional, becomes one of statutory construction." *Herron*, 1991-NMSC-012, ¶ 6.

**{46}** "[T]he unit of prosecution for a crime is the actus reus, the physical conduct of the defendant." *United States v. Prestenbach*, 230 F.3d 780, 783 (5th Cir. 2000). "Courts consider the elements of a crime more often than a criminal statute's unit of prosecution. The two can easily be confused but are conceptually distinct." *United States v. Rentz*, 777 F.3d 1105, 1117 (10th Cir. 2015) (Matheson, J., concurring). "The elements of an offense define what must be proved to convict a defendant of a crime." *Id.* "By contrast, the unit of prosecution defines *how many* offenses the defendant has committed. It determines

12

whether conduct constitutes one or several violations of a single statutory provision." *Id.* (internal quotation marks and citation omitted).

**{47}** To determine the Legislature's intent with respect to the unit of prosecution for a criminal offense, we apply a two-step test. *Bernal*, 2006-NMSC-050, ¶ 14. "First, we review the statutory language for guidance on the unit of prosecution." *Id.* "The plain language of the statute is the primary indicator of legislative intent." *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230. "If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete." *Bernal*, 2006-NMSC-050, ¶ 14. "If the language is not clear, then we move to the second step, in which we determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Id.* (internal quotation marks and citation omitted). "If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the legislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *Id.*

**b.        Step one:  plain language**

**{48}** Section 30-6-1(D)(1) provides as follows: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health . . . ." Can we discern from this language what our Legislature intended as to the unit of prosecution? We see two possibilities.  But before turning to those possibilities, we make two observations.

**{49}** We first observe that the New Mexico appellate courts have never squarely addressed whether the statutory language of Section 30-6-1(D)(1) clearly articulates a unit of prosecution.  Review of the Court of Appeals' treatment of this issue reveals that step one has been overlooked.  In *State v. Castañeda*, the Court correctly identified the two-step unit-of-prosecution analysis, but skipped step one without explanation. 2001-NMCA-052, ¶¶ 12-18, 130 N.M. 679, 30 P.3d 368.  Then, in *State v. Chavez*, the Court cited *Castañeda* as having sufficiently settled step one of the analysis.  *Chavez*, 2008-NMCA-126, ¶ 18, 145 N.M. 11, 193 P.3d 558, *rev'd on other grounds by* 2009-NMSC-035, ¶¶ 3, 53, 146 N.M. 434, 211 P.3d 891.  *Castañeda* did not settle the analysis.

**{50}** We also observe that Section 30-6-1(D)(1) encompasses abuse by endangerment that results in physical or emotional injury as well as those circumstances where the abused child suffers no injury of any kind at all. *Compare State v. Lujan*, 1985-NMCA-111, ¶¶ 5, 16, 103 N.M. 667, 712 P.2d 13 (concluding that the defendant endangered a child's life in violation of the abuse by endangerment statute where he and several companions, while driving, threw bottles and other objects at the occupants of another moving vehicle and hit the infant-victim-occupant on the head when one of the thrown objects entered the targeted vehicle and ricocheted in the infant's direction), *and State v. Trujillo*, 2002-NMCA-100, ¶ 20, 132 N.M. 649, 53 P.3d 909 ("[T]here may be instances when the risk of emotional harm from a similar

13

incident might be sufficient to support a conviction based on endangerment."), *with Castañeda*, 2001-NMCA-052, ¶ 15 ("Pursuant to the statute, a person may be guilty of child abuse even if the child is not actually harmed."); *see also* § 30-6-1(E), (F), (G), (H) (apportioning different penalties for those who commit abuse of a child depending upon whether the abuse *does not* cause great bodily harm, *does* cause great bodily harm, or causes death).

**{51}** Returning now to whether the unit of prosecution is clear from the plain language of the statute, the first possible resolution to this issue arises from the fact that, as we have just observed, a defendant may be convicted of abuse by endangerment even where there is no evidence the abused child was injured. Indeed, the endangered child may be entirely oblivious to the endangerment. This fact suggests that Section 30-6-1(D)(1) is not concerned with resultant consequences, and this view finds support in our case law. We have previously explained that "the legislative purpose that animates the child endangerment statute [is] to punish *conduct* that creates a truly significant risk of serious harm to children." *Chavez*, 2009-NMSC-035, ¶ 22 (emphasis added). Thus, one reading of the statute is that its gravamen is the prohibition of conduct. *See United States v. Evans*, 854 F.2d 56, 60 (5th Cir. 1988) (considering the gravamen of a criminal statute to determine that statute's unit of prosecution); *State v. House*, 2001-NMCA-011, ¶ 20, 130 N.M. 418, 25 P.3d 257 (same)*; Harris v. State*, 359 S.W.3d 625, 632 (Tex. Crim. App. 2011) (same). In other words, Section 30-6-1(D)(1) achieves its purposes by focusing on and prohibiting a course of conduct and not by focusing on the resultant consequences of that prohibited conduct. *Cf. Ebeling v. State*, 91 P.3d 599, 601 (Nev. 2004) (concluding that the district court erred in sentencing the defendant to two counts of indecent exposure—one count for each of the two victims to which the defendant exposed himself—because Nevada's indecent exposure statute "does not require proof of intent to offend an observer" or proof "that the exposure was observed" but requires only "that the public sexual conduct or exposure was intentional" (internal quotation marks and citation omitted)); *Harris*, 359 S.W.3d at 632 (concluding that "the gravamen of the offense of indecency with a child by exposure is the act of exposure[,]" that "[t]he allowable unit of prosecution for the offense is the act of exposure," and that the defendant committed only one act of indecency despite the fact that "he exposed himself to three children at the same time"). Specifically, the statute prohibits *causing* or *permitting* a child to be placed in a situation that endangers that child's life or health. Stated in grammatical terms, the unit of prosecution for Section 30-6-1(D)(1) is bound up in the verbs "causing" or "permitting." *See Rentz*, 777 F.3d at 1109 ("When seeking a statute's unit of prosecution . . . the feature that naturally draws our immediate attention is the statute's verb. This comes as no surprise, of course, as the verb supplies the action or doing part of most any sentence, statutory or otherwise.").

**{52}** The second possibility we perceive as to what the unit of prosecution might be based on the plain language of the statute rests on the fact that defendants can only engage in abuse of a child by endangerment if they cause or permit *a child* to be placed in a situation of endangerment. Stated grammatically, the statute contains a direct object that is the recipient of the actions of Section 30-6-1(D)(1)'s verbs, and that direct object is a singular noun. This

14

suggests that our Legislature intended the protections of Section 30-6-1(D)(1) to attach to *each child* endangered, and this, in turn, suggests that the unit of prosecution for Section 30-6-1(D)(1) is *by child*. *See Harris*, 359 S.W.3d at 630 ("[A] legislative reference to an item in the singular suggests that each instance of that item is a separate unit of prosecution." (internal quotation marks and citation omitted)); *see also People v. San Nicolas*, 2001 Guam 4 ¶ 21 (observing that Guam's child abuse statute "refers to a person's actions with regard to 'a child'" and, therefore, concluding that "it is evident that the legislature intended that each separate child be the appropriate unit of prosecution"); *cf. People v. Arzabala*, 2012 COA 99 ¶¶ 27, 29 (concluding that the unit of prosecution for Colorado's statute criminalizing leaving the scene of an accident is per accident scene because the compound noun "accident scene" appears repeatedly in singular form and is preceded by a definite article).

**{53}** Significantly, our Legislature chose not to employ the phrase "any child" or the word "children" in place of "a child." Had it done so, Section 30-6-1(D)(1) would have expressly contemplated that more than one child may be affected by a single course of abuse by endangerment and this, in turn, would suggest that the focus of the statute is the prohibition of conduct towards a particular class of persons. *See State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753 ("[T]he Legislature knows how to include language in a statute if it so desires." (alteration in original) (internal quotation marks and citation omitted)). Our Legislature did not do this and instead specifically prohibited the commission of certain acts against a singular and discrete entity: "a child." It is well established—so much so that the proposition is repeatedly expressed in non-precedential opinions—that where a statute prohibits the doing of some act to a victim specified by a singular noun, "a person" for example, then "the person" is the unit of prosecution. *See State v. Vega*, No. 33,363, dec. ¶ 60 (N.M. Sup. Ct. Jan. 9, 2014) (non-precedential) ("[W]e agree with the State that, under our first-degree murder statute, the unit of prosecution is unambiguous: the killing of one human being by another. . . . The number of murder charges depends on the number of victims. The notion that one death should result in only one homicide conviction is firmly embedded in our jurisprudence." (internal quotation marks and citation omitted)); *State v. Armendariz*, No. 29,101, mem. op. ¶ 23 (N.M. Ct. App. May 1, 2012) (non-precedential) ("The nature of assault offenses encapsulates their personal nature and the individual victim as the proper unit of prosecution."); *State v. Clymo*, No. 30,005, mem. op. ¶ 29 (N.M. Ct. App. Aug. 16, 2010) (non-precedential) ("It appears that the wording of the statute evinces a legislative intent to punish each act of false imprisonment against each person."); *House*, 2001-NMCA-011, ¶ 20 ("[T]he subject of punishment of vehicular homicide is *the killing of another*, not the unlawful operation of a motor vehicle." (emphasis added)). All of this points to the conclusion that the unit of prosecution for Section 30-6-1(D)(1) is by child.

**{54}** Policy considerations further support this latter interpretation of the statute. *See State v. Ogden*, 1994-NMSC-029, ¶ 27, 118 N.M. 234, 880 P.2d 845 ("[T]he language of penal statutes should be given a reasonable or common sense construction consonant with the objects of the legislation, and the evils sought to be overcome should be given special attention."). "[W]here there is but a single violent act and multiple victims, the societal harm

15

is greater. And, thus, the greater the harm, the greater the need to deter such conduct. To hold otherwise would encourage single-act-multiple-victim-type crimes." *State v. Johnson*, 1985-NMCA-074, ¶ 41, 103 N.M. 364, 707 P.2d 1174. To define the unit of prosecution for Section 30-6-1(D)(1) by course of conduct could encourage would-be perpetrators of child abuse by endangerment to endanger as many children as possible if they endanger any child at all. Our Legislature could not have meant this. Rather, it must have intended that there be a correlation between the number of children endangered and the total exposure to punishment. This reasoning has particular force in this context given that our Legislature has concluded that crimes against children suggest heightened culpability and that one purpose of the child-abuse-by-endangerment statute is to assure the protection of children, a highly vulnerable population. *State v. Santillanes*, 2001-NMSC-018, ¶ 24, 130 N.M. 464, 27 P.3d 456.

**{55}** Our discussion of these two possible interpretations of Section 30-6-1(D)(1)'s unit of prosecution demonstrates there are two equally valid ways of thinking about the unit of prosecution for this statute: either by conduct or by outcome. As arguments on either side have equal force and validity, we conclude that the statutory language is ambiguous as to the unit of prosecution. *See Maestas v. Zager*, 2007-NMSC-003, ¶ 9, 141 N.M. 154, 152 P.3d 141 ("A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses." (internal quotation marks and citation omitted)). We move to step two of the unit-of-prosecution analysis.

### c.      Step 2:  indicia of distinctness

**{56}** Under the second step of the unit-of-prosecution analysis, we "determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Bernal*, 2006-NMSC-050, ¶ 14  (internal quotation marks and citation omitted). Our case law instructs that we consider the temporal proximity of the acts, the location of the victim(s) during each act, the existence of an intervening event, the sequencing of acts, the defendant's intent as evinced by his or her conduct and utterances, and the number of victims. *See id.* ¶¶ 15, 17; *Herron*, 1991-NMSC-012, ¶ 15. If our analysis indicates that Ramirez's conduct constitutes "separate offenses under the statute, we will presume that to be the legislative intent, until the Legislature amends the statute to indicate otherwise." *State v. Morro*, 1999-NMCA-118, ¶ 11, 127 N.M. 763, 987 P.2d 420.

**{57}** We have previously observed that the number-of-victims factor has special significance: "[M]ultiple victims will likely give rise to multiple offenses." *Herron*, 1991-NMSC-012, ¶ 15; *see also Bernal*, 2006-NMSC-050, ¶ 18 ("While the existence of multiple victims does not, itself, settle whether conduct is unitary or distinct, it is a strong indicator of legislative intent to punish distinct conduct that can only be overcome by other factors."). This case involved multiple child victims who suffered distinct mental injuries as a consequence of Ramirez's actions. Carmen, Nikki, and Michael each testified to the mental anguish they individually experienced while Ramirez shot Vialpando nine times. Carmen

16

testified that, at the time of the shooting, she thought that she and her family would all die. It was patently reasonable for her to fear this potentiality. All three children testified that they were in fear and shock as they witnessed Ramirez shoot into the vehicle in which they and Vialpando were sitting and kill Vialpando. The number of shots fired is significant. Bullets entered and exited Vialpando. The chance that any one of the children might have been struck by one of the bullets fired into and through Vialpando increased as the number of shots fired increased. In light of these facts, we are persuaded that our Legislature intended multiple punishments in this case.

**d.      Conclusion:  unit of prosecution**

**{58}**      In the circumstances of this case in which each of the three children separately testified to the fear and shock they respectively suffered as a result of Ramirez's wanton conduct, we hold that the Legislature intended prosecution for three counts of child abuse by endangerment. Ramirez's three convictions for child abuse do not violate double jeopardy.

**III.      CONCLUSION**

**{59}**      Ramirez's conviction for shooting at a motor vehicle is vacated. His remaining convictions are affirmed. We remand this matter to the district court for resentencing.

**{60}      IT IS SO ORDERED.**

_____

**JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**