This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**NO. S-1-SC-37220**

**Filing Date: April 6, 2020**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**TERRICK L. THOMPKINS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Steven Blankinship, District Judge**

Gary C. Mitchell, P.C.
Gary C. Mitchell
Ruidoso, NM

for Appellant

Hector H. Balderas, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

**{1}** Defendant was tried and convicted by a jury of two counts of first-degree murder, child abuse resulting in great bodily harm, aggravated burglary, shooting at an occupied dwelling, and three counts of child abuse. Having received two life sentences plus forty-six years imprisonment, Defendant directly appeals to this Court. *See* N.M. Const. art. VI, § 2 (stating that appeals from the judgment of a trial court imposing a life sentence shall be taken directly to the Supreme Court); Rule 12-102(A)(1) NMRA (stating that

appeals from the trial court imposing a sentence of death or life imprisonment shall be taken to the Supreme Court). We affirm.

## I.     BACKGROUND

**{2}**     Defendant, who had been drinking and had a "good buzz going," set his cell phone alarm to go off sometime between 9 p.m. and 10 p.m. When the alarm went off, Defendant said "it's go time." Defendant was a military veteran and dressed himself in full tactical gear and armed himself with several guns and ammunition.

**{3}**     Defendant then drove to his ex-wife's (Jessica) home and fired seven bullets into the front door in the shape of a "T," which was Defendant's nickname. Defendant proceeded inside the home, pointing a gun at Jessica's oldest son, J.D. Defendant lowered the gun and made his way to the bedroom shared by Defendant's two young children, G.T. and I.T., where he found Jessica. Defendant shot and killed Jessica, with one bullet entering her right temple, one bullet entering just above her right ear, and one bullet entering the right side of her neck.

**{4}**     Jessica's boyfriend, Phillip, pulled J.D. into the master bedroom and moved a dresser in front of the door. Phillip used his body and the dresser to block the door but Defendant began firing shots through the door, and Phillip collapsed and died when a bullet struck him in the forehead. J.D. managed to escape by climbing out of the bedroom window, but was hit in the chest with shrapnel from the gun fire.

**{5}**     While the shootings occurred, Jessica's son, D.F., was in his own room which was located near the front door. D.F. was lying in bed and heard a scream and banging, but stayed in his bedroom because he believed if he left the room, he would get into trouble. When it got quiet, D.F. cracked open the door and police found D.F. and escorted him out of the home and into a police car.

**{6}**     When Officer Ryan Glidden arrived on scene, he observed that the front door had a "whole bunch of bullet holes" and was halfway open. As Officer Glidden approached the front door, he smelled burnt gunpowder and could see blood droplets and debris inside the home. Officer Glidden began searching the home and located D.F., who appeared terrified. Officer Glidden found Jessica lying on the floor of G.T's and I.T.'s bedroom, where both children were still in their bunk beds. Phillip was found lying against the dresser that he had used to block the door in the master bedroom.

**{7}**     After killing Jessica and Phillip, Defendant returned to his home and called 911. When the dispatcher answered, Defendant stated "Yeah, uh, I just killed my ex-wife. I live at 1207 North Florida. I'm standing outside. Please come get me." After losing contact with the dispatcher, Defendant called 911 a second time and stated "I was a great father to my kids and now you took my kids away. And yeah, I killed her. And you know what? I don't feel bad about it." Defendant also advised the dispatcher that he was going to "finish off" some Everclear. The dispatcher, who knew Defendant personally, talked to Defendant until police arrived, at which point Defendant surrendered.

**{8}** Defendant was arrested and taken to the police station to be interviewed. Initially, Defendant's speech was "somewhat slurred" but Defendant was "otherwise responsive" to the interviewing officer's instructions. Defendant eventually became incoherent and when he mentioned "something about medication," Defendant was taken to the hospital for medical treatment. Doctors determined that Defendant had a very high glucose level and that his diabetes was "out of control." Defendant's blood alcohol content (BAC), which was taken approximately six hours after the murders, measured .219 percent.

**{9}** After Defendant's release from the hospital three days later, he was interviewed a second time. Defendant stated that his children were removed from his custody as a result of allegations that Defendant was abusing them, which he denied. After Defendant's kids were taken, he stated that he "just wanted to kill everyone." Defendant "made sure everything was ready to go" and "took off to Jessica's." As he arrived at Jessica's home, Defendant told himself "don't do it" in contemplation, but proceeded inside anyway. Defendant stated that he remembered seeing Jessica and remembered being "in the room." Jessica was Defendant's "objective" and he "finished her off" with an AR-15. Defendant did not want Phillip around his kids because he was a "meth head." On the night of the murders, Defendant saw Phillip blocking the door as he tried to enter the master bedroom and confirmed that he "probably sprayed the door with lead."

**{10}** The day before the aforementioned incident, Defendant's children, G.T. and I.T., were removed from Defendant's custody and placed with their mother, Jessica. This occurred as a result of a note that I.T. gave to D.F. at school so he could pass it along to Jessica. I.T.'s note stated that Defendant had dropped I.T. and punched her in the stomach. Apparently, D.F.'s teacher found the note and reported what she found to the school nurse who relayed the information to the school counselor so I.T. could be interviewed. After the interview, D.F.'s teacher called the "mandatory reporting hotline" to report the alleged abuse. At the time of the removal, Defendant had full custody of the children and Jessica had supervised visitation.

**{11}** Defendant was charged with two counts of first-degree murder, child abuse resulting in great bodily harm with respect to J.D., aggravated burglary, shooting at an occupied dwelling, and three counts of child abuse with respect to G.T., I.T., and D.F. Defendant raised an insanity defense but the jury rejected his defense and returned guilty verdicts on all counts.

## II.    DISCUSSION

**{12}** We discuss (1) whether the trial court erred in refusing to direct a verdict for Defendant due to insanity, (2) whether the trial court erred in admitting evidence of Defendant's prior bad acts, (3) whether the trial court erred in refusing to admit expert testimony regarding Defendant's BAC, (4) whether the trial court erred in refusing to instruct the jury on diminished capacity for each count of child abuse, and (5) whether the trial court erred in not dismissing one count of child abuse as it related to D.F.

## A. Denial of Directed Verdict on the Basis of Insanity

**{13}** Defendant argues that Defendant's medical records, military records, and testing by the experts in this case indicate that Defendant suffered from "long standing mental disease." Due to his mental disease, Defendant contends that he "was unable to control his own behavior and to stop himself." Defendant asserts that the trial court erred in denying Defendant's request for a directed verdict because there was insufficient evidence to overcome Defendant's insanity defense.

**{14}** The State responds that a directed verdict would have been improper because there was ample evidence of Defendant's sanity, provided by both expert and lay testimony. The State argues that the jury was entitled to reject Defendant's expert testimony supporting insanity and that "he is not entitled to have this evidence re-weighed on appeal."

**{15}** "Our review of the denial of a directed verdict motion asks whether sufficient evidence was adduced to support the underlying charge." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198. "Except in a case where the evidence of insanity is so clear as to require a directed verdict, i.e., the presumption of sanity is rebutted as a matter of law, the presumption abides with the state throughout the case and continues even after the defendant has made a sufficient showing to procure insanity instructions." *State v. Wilson*, 1973-NMSC-093, ¶ 16, 85 N.M. 552, 514 P.2d 603. Where there is conflicting evidence regarding a defendant's insanity, the defendant's sanity presents a question of fact to be determined by the jury. *See State v. Moore*, 1938-NMSC-007, ¶ 46, 42 N.M. 135, 76 P.2d 19 ("When [] evidence is received which tends to show that the accused was insane at the time of the alleged offense, then, in such case, an issue is raised as to the mental condition of the accused, and it becomes *the duty of the jury* to determine such issue from the evidence independent of the presumption of sanity.").

**{16}** In *Moore*, the defendant was charged with first-degree murder after killing the victim, his wife's paramour. *Id.* ¶¶ 1-2. The defendant saw his wife walking along the street with the victim when he approached them, grabbed the victim and shot him four times. *Id.* ¶ 39. When the defendant was arrested, he "appeared in a nervous, excited condition, having a dazed and unnatural look in his face" and when asked why he shot the victim, the defendant stated "I shot him, I intended to kill him. He treated me worse than any man ever treated me. That woman is my wife." *Id.* (internal quotation marks omitted).

**{17}** The defendant presented the testimony of two doctors who opined that the defendant was insane due to his hereditary background and that the defendant "was not sufficiently mentally well-balanced to know and determine the right from wrong, and that the defendant did not understand the seriousness of his act and the consequence thereof." *Id.* ¶¶ 38-41. The State presented conflicting testimony from a doctor who opined that the defendant understood the acts and consequences except at the very moment of the act, but "probably due to the excitement and the anger, was the cause of

his loss of reasoning power momentarily." *Id.* ¶¶ 43-44. Apparently, the jury rejected the evidence that the defendant was insane and convicted him of voluntary manslaughter. *Id.* ¶ 1.

**{18}** On appeal, the defendant argued that he was entitled to a directed verdict at trial based on evidence that "conclusively show[ed] he was insane at the time he fired the shots" which killed the victim. *Id.* ¶ 37. This Court reasoned that "the jury could rightly disagree with the experts and bring in a verdict of guilty, and we believe that there is substantial evidence to support the jury's verdict." *Id.* ¶ 45. The Court also noted that beyond the testimony of the doctors, the evidence showed that the defendant "knew what he was doing and why he was doing it." *Id.* ¶ 55. The defendant went to the location where his wife and the victim were located, armed, and followed them along the street and then shot the victim. *Id.* A police officer testified that when he encountered the defendant, he asked "what is the matter boy?" and the defendant replied "I tried to kill this man, wanted to kill him." *Id.* (internal quotation marks omitted). When the officer asked the defendant why he wanted to kill the victim, he replied "Well he done me worse than any man ever done me" and also said "Well, that is my wife he is with." *Id.* (internal quotation marks omitted). In affirming the defendant's conviction, this Court concluded that his statements were part of the conflicting evidence that the jury could consider in determining whether the defendant was sane or insane and held that a determination of sanity "is left to the jury[.]" *Id.* ¶¶ 64-65, 70.

**{19}** In the instant case, Defendant told police that he intended to get drunk and "polish himself off," i.e., commit suicide. Defendant stated that he "didn't have his kids," and for the past month, his life had been "spiraling into shit." Defendant "had been doing so good" and had not "been to jail" in seven or eight years. When Defendant's kids were taken, he was "done" and he was just going to get drunk and "bite the bullet." Defendant stated that his plan was to commit suicide but he apparently changed his mind, committed the murders, and then changed his "exit plan" to "suicide by cop."

**{20}** Dr. Gary Jackson, who reviewed Defendant's military and medical records, was called to testify about Defendant's condition on the night of the incident. Dr. Jackson testified that Defendant was admitted to the hospital for "mental confusion" and a diabetic condition that was out of control. Defendant had a "very high level of glucose" and was at risk for developing "diabetic ketoacidosis" which could lead to nausea, vomiting and could induce a diabetic coma. Defendant was admitted to the intensive care unit so that he could be "closely watched," and so his blood sugar could be monitored.

**{21}** Dr. Jackson stated that there were "other intervening factors" in Defendant's health which included anxiety, schizoaffective disorder, and depression. A review of Defendant's medical records reflected that Defendant was being treated for post-traumatic stress disorder (PTSD) with several medications to stabilize "manic thoughts and depression." Defendant's military records showed that Defendant had been awarded 100 percent disability as a result of his PTSD diagnosis and a traumatic brain injury that Defendant suffered during his military service.

**{22}** To support his insanity defense at trial, Defendant offered the expert testimony of Dr. Eric Westfried, who opined that Defendant experienced a "traumatic event" when his children were removed and "could not prevent" the actions that followed due to a "loss of control." Dr. Westfried testified that Defendant suffered from significant anxiety, PTSD, and paranoia that caused Defendant to become "unglued from reality." Dr. Westfried stated that Defendant was diagnosed with PTSD due to childhood trauma, which worsened after Defendant entered the military. Defendant also related to Dr. Westfried that as a child, he had been beaten, sexually assaulted and stabbed. In addition, Defendant's military records showed that Defendant received a traumatic brain injury while serving in the military. Dr. Westfried testified that Defendant's IQ dropped from 122 to 107 as a result of brain damage. Dr. Westfried stated that the change in Defendant's IQ was a "huge drop" and "if that happened to me, I could not sit up here and do what I'm doing right now. My career would be over."

**{23}** On cross-examination, Dr. Westfried, who had not reviewed Defendant's video-recorded police interview, admitted that Defendant's contemplation about whether to go into Jessica's home on the night of the incident would "potentially" change his opinion with respect to deliberate intention. Dr. Westfried also stated that, hypothetically, pointing and then lowering a gun would demonstrate a "choice," but in this case, Dr. Westfried was not "sure what's going on there" when Defendant lowered his gun from J.D. upon entering Jessica's home. Dr. Westfried conceded that Defendant's statement on the 911 call that he had killed Jessica and "didn't even feel bad about it" was a "commentary on right versus wrong." Dr. Westfried also testified that he was unaware of any threats made by Defendant and acknowledged that threats made within weeks before the murders would be "a real concern" that should be considered as to premeditation.

**{24}** The State challenged Defendant's insanity defense with expert testimony provided by Dr. Ned Siegel. Dr. Siegel concluded that Defendant "made a decision, he was upset, no argument about that, that the children were taken away. That he made a decision and followed through with his plan to do what he did. That was very clear." Defendant specified to both Dr. Siegel and Dr. Westfried that the only "plan" Defendant had was to kill himself, but otherwise did not remember anything. Dr. Siegel commented that Dr. Westfried never got to see the Defendant's police interview where Defendant "remembers pretty much everything." Dr. Siegel opined that Defendant had the "capacity to remember" and "declared an intention some days before and followed through with it." Dr. Siegel explained that while Defendant's behaviors both before and after he entered the military were irresponsible, none of those behaviors were the product of psychosis. Dr. Siegel opined that Defendant's comment during his police interview that he had not been in trouble for the last seven or eight years showed Defendant had control of his behavior. There was no dispute that Defendant had a "long standing disorder" but prior to the events in question, Defendant was "doing pretty good." Defendant was awarded full custody of his children, held various jobs with "periods of good times of work," and did some legal work on his own behalf.

**{25}** According to Dr. Siegel, there was no link between Defendant's PTSD and the events in question. That was made clear to Dr. Siegel by Defendant's "declarations and plans" to "kill people" and "embarked on his plan." When asked whether or not Defendant knew what he was doing and understood the consequences of his actions, Dr. Siegel testified that Defendant understood what would happen and referenced Defendant "debating with himself" whether or not to go inside the house on the night of the incident. As to whether Defendant knew the "act was wrong," Dr. Siegel referenced Defendant's statements that he did not feel bad about killing Jessica and knew it was "a forbidden act." Dr. Siegel also disagreed with Dr. Westfried's opinion that Defendant could not prevent himself from committing "the act" because there was no explanation or evidence of "loss of control." Additionally, there was nothing to lead Dr. Siegel to believe there was any kind of "disassociation" where Defendant had an "out of body experience" or "blacked out."

**{26}** Dr. Siegel also pointed to the fact that Defendant was able to recall his conversation with the dispatcher three days after the incident during his second police interview, made a conscious decision to lower his weapon when he first encountered J.D. at Jessica's home, and changed his original plan from suicide to "suicide by cop," which showed deliberation. Dr. Siegel believed Defendant's behavior was "goal-oriented conduct" that demonstrated a plan Defendant had enacted.

**{27}** The State's expert, Dr. Siegel, provided testimony which clearly contradicted Defendant's expert, Dr. Westfried, on the issue of Defendant's sanity. Because the evidence in this case was clearly disputed, the determination of Defendant's sanity was a question for the jury to decide. Defendant's motion for a directed verdict was properly denied and we affirm on this issue.

## B.    Prior Bad Act Evidence

**{28}** Prior to trial, the State filed a "notice of intent to use 11-404(B)(2) evidence" stating that the State intended to use the testimony of Linda Chaparro, who was in a "personal relationship" with Defendant, to show Defendant's "intent, motive, knowledge, absence of mistake, or lack of accident concerning the charges . . . and also serves as rebuttal evidence against Defendant's claim of insanity."

**{29}** Defendant specifically takes issue with Linda's testimony regarding (1) threats Defendant made to kill Jessica, and (2) a domestic dispute that occurred between Linda and Defendant. With regard to Linda's testimony concerning Defendant's threats to kill Jessica, her children, and her boyfriend, the State contends that the testimony was admissible to prove preparation, plan, and the premeditated nature of the murders. The State concedes that Linda's testimony regarding the domestic dispute was improper but argues it was brief, devoid of detail, had no bearing on Defendant's insanity defense and was therefore, harmless error.

### 1.    Defendant's threats

**{30}** Linda testified that she grew up with Defendant and he was her boyfriend for a period of time and leading up to the incident. Linda stated that every time Defendant spoke about Jessica, it was negative. Custody of his children was extremely important to Defendant and custody issues would come up once or twice a month. Linda testified about one specific instance where Defendant became angry when Jessica passed a drug test prior to an upcoming custody hearing because Defendant was sure Jessica was using drugs. Linda stated that every time Defendant became angry with Jessica, he would say "I should go down the street, kick in her door, shoot her, shoot her boyfriend, and shoot her two bastard children." Defendant made that statement to Linda roughly six to ten times.

**{31}** "We examine the admission of evidence for abuse of discretion." *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted).

**{32}** "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1) NMRA. "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2) NMRA. "This list is not exhaustive and evidence of other wrongs may be admissible on alternative relevant bases so long as it is not admitted to prove conformity with character." *State v. Otto*, 2007-NMSC-012, ¶ 10, 141 N.M. 443, 157 P.3d 8 (internal quotation marks and citation omitted).

**{33}** In *State v. Niewiadowski*, 1995-NMCA-083, ¶¶ 5, 16, 120 N.M. 361, 901 P.2d 779, our Court of Appeals held that the trial court did not abuse its discretion in admitting evidence that the defendant threatened to kill the victim prior to the victim's murder. In that case, the defendant communicated to a third party that she should tell the victim to "watch his back, he's going to die." *Id.* (internal quotation marks omitted). Nine days later, after an argument between the defendant and the victim escalated to a physical fight, the defendant went to his vehicle, retrieved a gun, and shot the victim in the back, killing him. *Id.* ¶¶ 6-7. The Court of Appeals held that evidence of the defendant's threat against the victim was admissible because it permitted a reasonable inference that the defendant deliberately intended to take away the victim's life. *Id.* ¶ 14. The Court of Appeals concluded that the defendant's specific intent was at issue and the threats were evidence of the defendant's intent and not merely the defendant's propensity for violence. *Id.*

**{34}** In order for the jury to find Defendant guilty of first-degree murder in this case, the State was required to prove beyond a reasonable doubt that the killings were committed "with the deliberate intention to take away the life" of Jessica and her boyfriend, Phillip. Additionally, because Defendant raised the defense of insanity, the

State was also required to prove that Defendant was not "suffering from a mental disease or disorder at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another[.]" The testimony that Defendant had threatened Jessica and her family on multiple occasions prior to the murders was relevant to whether Defendant had the deliberate intent to commit the murders and to whether Defendant was insane at the time the murders were committed. The trial court's admission of Linda's testimony regarding threats Defendant made against Jessica was not an abuse of discretion.

## 2.    The domestic dispute

{35}    At trial, the State asked Linda if there was an "altercation requiring the police to come over and talk with you?" When Linda replied "yes," the State asked her to "generally tell members of the jury what happened." Linda began describing an argument she had with Defendant. The argument happened after Linda discovered text messages on Defendant's phone between Defendant and Jessica. Defendant was flirting and complimenting Jessica and "he wasn't supposed to be having that kind of relationship with Jessica." This resulted in an argument which "led to [Defendant] throwing me around the house." Defendant called the police and "charges were filed."

{36}    The State next asked Linda if Defendant had ever provided any explanation as to why he was flirting with Jessica but when Linda attempted to answer, Defendant objected on the basis that the testimony was "way beyond the scope" and the trial court sustained the objection. The State then asked to approach and during a sidebar conference, argued that this testimony was relevant because Defendant was trying to befriend Jessica "in order to get information for the custody proceedings." Defendant continued to object and the judge stated that he did not want to "place any more emphasis on it" and again, sustained the objection.

{37}    "We review improperly admitted evidence for non-constitutional harmless error." *State v. Serna*, 2013-NMSC-033, ¶ 22, 305 P.3d 936. "Non-constitutional error is harmless when there is no reasonable probability the error affected the verdict." *Id.* (alterations omitted) (internal quotation marks and citation omitted). "When assessing the probable effect of evidentiary error, courts should evaluate all of the circumstances surrounding the error." *Id.* ¶ 23 (internal quotation marks omitted). "This includes the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Id.*

{38}    Linda's testimony was not the only source through which the jury learned of the domestic dispute between her and Defendant. The jury also heard State's Exhibit 151, a video recording of Defendant's second police interview, which was admitted without objection. During that interview, Defendant described a domestic dispute that he had with Linda where he "had to do some things to get her off of me." Defendant stated that

he was taken to jail even though he was the one who had called police because "they said that I had left fingerprints and shit on her."

**{39}** Moreover, there was little emphasis placed on the evidence, as Linda's testimony regarding the dispute was brief and ceased upon Defendant's objection. The importance of the erroneously admitted testimony to the State's case, according to the State, was to show that the custody of Defendant's children was "of utmost importance to the Defendant in his seemingly focused control over Jessica," but Linda's testimony had little to no importance to the State's case because Defendant's own statements revealed his feelings concerning the children's removal from his custody.

**{40}** We cannot say, in light of the overwhelming evidence against Defendant in this case, that there is any reasonable probability that Defendant was convicted on all charges, including two counts of first-degree murder, due to Linda's brief testimony concerning the domestic dispute. We therefore agree with the State that the admission of Linda's testimony regarding the domestic dispute was in error, but harmless.

## C.  Defendant's Blood Alcohol Content

**{41}** Defendant argues that it was error for the trial court to exclude testimony concerning Defendant's BAC on the night of the murders. Defendant contends that there was no reason to prohibit testimony regarding Defendant's exact BAC based on his hospital records and such an error warrants reversal.

**{42}** The State responds that the testimony was not relevant because Defendant's BAC was taken six hours after the murders occurred and it would only be relevant if it could be used to relate back to Defendant's BAC at the time of the murders. The State asserts this was impossible because Defendant consumed alcohol after the murders. In any event, retrograde extrapolation was not performed.

**{43}** "The admission or exclusion of evidence is within the discretion of the trial court. On appeal, the trial court's discretion is reviewed for an abuse of discretion." *State v. Hughey*, 2007-NMSC-036, ¶ 9, 142 N.M. 83, 163 P.3d 470 (citing to *State v. Armendariz*, 2006-NMSC-036, ¶ 6, 140 N.M. 182, 141 P.3d 526).

**{44}** Defendant's exact BAC was admitted through the arresting police officer's testimony. The officer clearly stated that the Defendant's BAC was .219 percent and that he learned of this as a result of Defendant's hospital records. Defendant's assertion that the trial court "allowed the witnesses [Defendant's experts] to testify to a high degree of intoxication but not to the specific number" is misleading because evidence of the "specific number" was indeed admitted. Asking the experts to relate the same information that the arresting officer had already testified to would add nothing. The question of Defendant's BAC taken at the hospital had already been asked and answered prior to the testimony of Defendant's experts. There was no abuse of discretion in excluding this cumulative evidence.

## D.     Instruction on Diminished Capacity

**{45}**     Defendant argues that the trial court erred in denying Defendant's requested instruction, based on Uniform Jury Instruction (UJI) 14-5111 NMRA, for diminished capacity as to each count of child abuse. Defendant contends that "[i]ntentional child abuse by endangerment requires proof that a defendant acted with conscious objective to endanger [a] child" and that for a conviction to lie, "the state must prove that the defendant acted with a *culpable mens rea*, a morally blameworthy mental state or 'intent.'"

**{46}**     The State responds that the Defendant's proffered jury instruction tracked the language of UJI 14-5111, which "is given only when the crime is a 'specific intent' crime." (Emphasis omitted.) The State argues that Defendant was not entitled to an instruction on diminished capacity on the child abuse counts because none of the counts required proof of specific intent, as the State's theory of the case was that Defendant showed reckless disregard when firing into Jessica's home where four children were present.

**{47}**      "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Gaines*, 2001-NMSC-036, ¶ 4, 131 N.M. 347, 36 P.3d 438. A defendant "is entitled to an instruction as to any defense, provided the instruction has an evidentiary foundation and accurately states the law." *Id.* ¶ 6 (citing *Mathews v. United States,* 485 U.S. 58, 63, 108 S. Ct. 883, 99 L.Ed.2d 54 (1988)). "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *State v. Baxendale*, 2016-NMCA-048, ¶ 10, 370 P.3d 813 (internal quotation marks omitted).

**{48}**     UJI 14-5111 is to be "used for the intoxication or mental disease defense for a crime which includes an element of intent *to do a further act or achieve a further consequence.*" UJI 14-5111, n.1 (emphasis added). We have defined a specific intent crime as one for which a statute expressly requires proof of "*intent to do a further act or achieve a further consequence.*" *State v. Brown*, 1996-NMSC-073, ¶ 22, 122 N.M. 724, 931 P.2d 69 (emphasis added) (internal quotation marks omitted). Therefore, UJI 14-5111 is to be used only when specific intent is at issue.

**{49}**     The intent required for intentional child abuse "requires a conscious objective to endanger a child." *State v. Granillo*, 2016-NMCA-094, ¶ 21, 384 P.3d 1121. On the other hand, negligent child abuse "require[s] proof that the defendant knew or should have known of the danger involved and acted with a reckless disregard for the [safety] or health of the child." *State v. Consaul*, 2014-NMSC-030, ¶ 32, 332 P.3d 850. Because recklessness is the standard of culpability necessary to prove negligent child abuse, an instruction on diminished capacity where no specific intent is at issue is not appropriate. *See id.* ¶ 38 (holding that the standard of culpability for negligent child abuse is recklessness).

**{50}** To convict Defendant of negligent child abuse in the present case, the State was required to prove Defendant's conduct showed a "reckless disregard for the safety or health" of the children. *See State v. Ramirez*, 2018-NMSC-003, ¶ 17, 409 P.3d 902 (holding that the child abuse instruction did not require the jury to find that the defendant intended to harm the children or that he actually physically harm the children, but rather, the instruction required the jury find that the children be placed in a "situation that endangered the life or health" of the children). As UJI 14-5111 only applies to those crimes that require a finding of specific intent and where Defendant is charged with negligent child abuse due to reckless disregard, the trial court properly denied the diminished capacity instruction.

## E.    Child Abuse Related to D.F.

**{51}** Defendant argues that the trial court erred "in not dismissing the child abuse *resulting in death or great bodily harm*" because D.F. was not injured and did not witness the shooting. (Emphasis added). Defendant was not convicted for child abuse resulting in great bodily harm as to D.F., but rather, for J.D. who was struck in the chest by shrapnel. Because we believe this to be a typographical error, we address Defendant's conviction for child abuse as it relates D.F.

**{52}** Defendant argues that because there was insufficient evidence to convict for child abuse in relation to D.F., the trial court should have directed a verdict on this charge. The State responds that there was sufficient evidence of child abuse as to D.F. because "Defendant's conduct caused a substantial risk of harm to D.F. by shooting up his home during the murders." The State asserts that the evidence must only show a "truly significant risk of serious harm" to the child, citing *State v. Chavez*, 2009-NMSC-035, ¶ 22, 146 N.M. 434, 211 P.3d 891.

**{53}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Guerra*, 2012-NMSC-027, ¶ 10, 284 P.3d 1076 (internal quotation marks and citation omitted). "The reviewing court views the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (alteration omitted) (internal quotation marks and citation omitted).

**{54}** Defendant was charged and convicted of child abuse under NMSA 1978, Section 30-6-1(D) (2009), which provides, in pertinent part, that "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health[.]" We stated in *Consaul* that "[t]he Legislature provided that 'negligently' refers to criminal negligence and means that a person knew or should have known of the danger involved *and* acted with reckless disregard for the safety or health of the child." 2014-NMSC-030, ¶ 33.

**{55}** In *Ramirez*, the defendant was convicted of, among others, three counts of child abuse under Section 30-6-1(D). 2018-NMSC-003, ¶ 3. At the defendant's trial, the State presented evidence that the defendant fired a gun at the victim while the victim was seated in the front passenger seat of a Durango vehicle. *Id.* ¶ 18. At the time of the shooting, three children were seated in the back seats of the Durango. *Id.* The jury heard evidence that although the victim had been shot nine times, only five bullets were found inside of the victim's body. *Id.* "Several of the bullets [the defendant] fired traveled through [the victim] and continued onward. One of those bullets traveled through the driver's-side window in the second row of seats of the Durango and another bullet was recovered from the headliner or inside roof of the Durango." *Id.* This Court concluded that

> From this evidence, the jury could reasonably infer that it was sheer luck that the children were not struck by one of the bullets [the defendant] fired at [the victim]. Thus, we have no doubt that the evidence presented is sufficient to support the jury's determination that [the defendant] placed the three children in a situation that endangered their lives and that [the defendant] showed reckless disregard for their safety and health.

*Id.*

**{56}** The facts in the present case are notably similar to *Ramirez*. At trial, the State presented evidence that Defendant was armed with several guns, ammunition, and was dressed in full tactical gear when he drove to Jessica's home. Defendant shot seven bullets into the front door where D.F.'s bedroom was shown to be located near the front door. Defendant also admitted that he "probably sprayed the [master bedroom] door with lead." With at least thirty-two spent cartridge casings found, the jury could, and did, infer that D.F.'s life was endangered by Defendant's act of shooting throughout the home with reckless disregard. We affirm Defendant's conviction for child abuse related to D.F. on the basis that there was sufficient evidence to support the conviction.

## III.    CONCLUSION

**{57}** The judgment and sentence is affirmed.

**{58}   IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**